**REVISED**

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 96-31181
_____

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

versus

MICHAEL O'KEEFE, SR; ERIC SCHMIDT; JOHN
O'BRIEN; GARY BENNETT; PAUL SCHMITZ,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana

_____

November 11, 1997

Before WISDOM, JOLLY and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

The United States appeals the district court's order granting a new trial and its denial of the government's motions for reconsideration of its order granting a new trial and to enforce the recusal of Chief Judge Morey L. Sear following the convictions of Michael O'Keefe, Sr., Eric Schmidt, John O'Brien, Gary Bennett, and Paul Schmitz (collectively "O'Keefe"). We vacate the order granting a new trial and remand to the district court to consider O'Keefe's remaining arguments, as yet unaddressed, for new trial. We deny the government's request to remand this case to a judge

outside the Eastern District of Louisiana.

I

We briefly outline the facts of this case insofar as they are relevant to this appeal, largely concerning procedural matters. O'Keefe operated the management company of Physicians National Risk Retention Group ("PNRRG"), a Louisiana medical malpractice insurer, and the other defendants were involved with the company in various capacities. When PNRRG became insolvent and the state of Louisiana moved to have it liquidated, the defendants arranged to have Builders and Contractors Insurance, Limited ("BCI"), a Bahamian corporation run by Charles Donaldson, act as a reinsurer. Various assets of PNRRG were taken out of PNRRG's estate to cover liabilities and claims that were transferred to BCI, and put in the trust account of O'Keefe's law firm on behalf of BCI. Ultimately, a large portion of these assets of PNRRG found their way into the personal bank accounts of the defendants through a complex scheme found by the jury to be fraudulent.

In a series of indictments listing differing factual bases whose relevance we shall discuss later, a grand jury charged O'Keefe and the other defendants with multiple crimes, including conspiracy, wire fraud, mail fraud, and money laundering. The two main government witnesses were Donaldson and Johnny Moore, participants in the scheme. During pre-trial preparation, a Federal Bureau of Investigation ("FBI") 302 report[1] was prepared

---

[1] An FBI 302 report is a typed transcription of the notes of an FBI agent's interview with a witness, usually prepared for testimony of a witness who may be presented at trial.

from the notes of FBI Special Agent Phillips based on a telephone interview between Donaldson, his attorney, government prosecutors, Phillips and other law enforcement personnel. According to the transcribed FBI 302 report of this interview, someone stated that "O'Keefe suggested that BCI's shareholders meeting minutes be altered to make it appear that Donaldson had authority to enter into the PNRRG/BCI contract" (the "minutes"). It is unclear who made this statement, but when Donaldson later pled guilty in the U.S. District Court for the Middle District of Louisiana to one count of mail fraud in exchange for his testimony in this case, the prosecutors incorporated this statement into the factual basis of the guilty plea in such a way as to make it appear that Donaldson made the statement.

During the trial against O'Keefe before Chief Judge Sear and immediately prior to Donaldson's direct testimony, the government provided a copy of the FBI 302 report to the defense, pursuant to the Jencks Act, 18 U.S.C. § 3500 *et. seq.* On direct questioning, the government did not ask any questions concerning the minutes, but when one of the defense attorneys questioned Donaldson about the minutes on cross-examination, Donaldson admitted to accusing O'Keefe falsely of participating in the alteration of the minutes.[2]

---

[2] The following colloquy occurred between Simmons, the attorney for O'Keefe, and Donaldson, on cross-examination:

Q: Did you tell anyone that Mr. O'Keefe had created those minutes of December '88 by the addition of the words "five years thereafter."
A: I don't recall. I--I know that I admitted I said that I created--I put them in myself.

-3-

```
Q:  That's not my--my question.  Let me rephrase it.
A:  Did--did I tell anyone that he suggested that?  I-I
can't recall if I did.

* * *

Q:  Since you've started cooperating with the Government,
when you're supposed to be truthfully, have you ever told
anyone that Mr. O'Keefe created those minutes of December
1988?  And by create I mean adding the five years
thereafter?
A:  I don't think so.  I may have.

Q:  You may have?
A:  Yes, I can't recall.  Was that a clear answer?  I
can't recall.

Q:  You're suggesting that you may have accused him of
creating documents that you created?
A:  I said I can't recall.

* * *

Q:  Isn't it a fact, Mr. Donaldson, that you told the
agent that Mr. O'Keefe suggested that the minutes be
altered?
A:  (No response)

Q:  Didn't you tell the agents that?
A:  No, I did not.

Q:  Your testimony under oath is that on March 3, 1995,
you did not tell Agent Susan Phillips that Mr. O'Keefe
suggested that the BCI shareholders minutes be altered to
make it appear that Donaldson had authority to enter into
the contract;  did you make that statement to the F.B.I.?
A:  At--I--I did, yes.

Q:  And that was a false statement, wasn't it sir?
A:  It was a false statement.

Q:  And you lied to the FBI, did you not?
A:  Yes I did.
```

Based on this exchange, the court found that Donaldson uttered four
possible falsehoods.  First, in court on cross-examination,
Donaldson falsely accused O'Keefe of participating in altering the
minutes.  Second, in his guilty plea, Donaldson agreed with the
factual basis of the plea, which contained the statement falsely
suggesting that O'Keefe participated in the alteration of the

-4-

In a sidebar conference that followed, the government denied that Donaldson had ever accused O'Keefe of helping to alter the minutes and stated that the FBI 302 report was mistaken if it attributed the statement to Donaldson, an explanation that the court rejected. On redirect, the government half-heartedly attempted to bolster Donaldson's credibility. After Donaldson left the stand, defense counsel moved to strike the testimony of Donaldson, which the court refused to do. In closing arguments, the defense highlighted Donaldson's impeachment, and the court included a strong statement admonishing the jury to consider carefully the credibility of witnesses in its jury instructions. Despite Donaldson's testimony and impeachment, the jury convicted O'Keefe and his co-defendants.

After trial, the defense made various post-trial motions, including a motion for new trial. Chief Judge Sear conducted a hearing on the motions at which the parties presented legal arguments but no evidence. The court granted the new trial motion because it found that Donaldson falsely accused O'Keefe of participating in the alteration of the minutes, and that the government knew about the falsehood because the two prosecutors gave inconsistent answers as to whether they learned of the falsehood prior to trial. The court also found that the long, drawn-out pauses before Donaldson answered the defense counsel's

minutes. Third, if Donaldson did not previously falsely accuse O'Keefe of participating in the alteration of the minutes, then he uttered a falsehood when he admitted in court that he had accused O'Keefe of participating in the alteration of the minutes. Finally, the court found that Donaldson uttered a falsehood when he stated that the government did not know, prior to trial, that he had lied concerning altering the minutes.

questions in the colloquy set out above supported an inference that the government knew about Donaldson's false accusation prior to trial. Several other factors reinforced the court's finding that Donaldson's false testimony warranted a new trial. First, the court found that the government's release of the FBI 302 reports to the defense complied with the Jencks Act, but did not comply with the government's obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963). Second, another key government witness, Moore, often changed his testimony, which became significant in light of Donaldson's false testimony. Third, the court found that the prosecution had redrafted the indictment in an attempt to mislead the defense by deleting counts connected to the minutes.

After granting the new trial, Chief Judge Sear disqualified himself from further involvement. This case was then assigned to Judge Mary Ann Vial Lemmon, and the government filed a motion for reconsideration of the order granting new trial ("motion for reconsideration"). Judge Lemmon transferred the case back to Chief Judge Sear, who denied both the government's motion to enforce recusal and the motion for reconsideration. This appeal timely followed.

## II

Prior to consideration of the merits, we resolve various challenges to our jurisdiction in this case. These jurisdictional challenges center on the government's notice of appeal, whether Chief Judge Sear appropriately ruled on the motion for

reconsideration after his recusal, and if we find that Chief Judge Sear should not have ruled on the motion for reconsideration, whether we must remand to Judge Lemmon to decide the motion for reconsideration.

A

O'Keefe argues that we have no jurisdiction to hear this appeal because the notice of appeal filed by the government fails to comport with the requirements of 18 U.S.C. § 3731, which governs interlocutory appeals by the government from orders granting new trial.[3]  The government's notice of appeal specified the denial of the reconsideration of the order granting new trial and the order mooting all other motions filed by the government, including the government's motion to enforce recusal of Chief Judge Sear. O'Keefe argues that because the government appealed the denial of the reconsideration of the order granting new trial rather than the order granting new trial, § 3731 does not permit jurisdiction over this appeal.

We rejected a similar jurisdictional challenge in *United States v. Greenwood*, 974 F.2d 1449 (5th Cir. 1992).  In response to the same type of argument raised by O'Keefe, the court stated that

---

[3]     18 U.S.C. § 3731 (1994) provides in relevant part:

In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court . . . granting a new trial after verdict or judgment . . . except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

*Id.*

-7-

> [a]lthough *in form* the Government's notice of appeal was from the district court's July 30 denial of the motion to reconsider, *in substance* the appeal is one from the district court's sentences imposed in the spring of 1991. . . . [S]o long as a notice of appeal puts the other side on notice that the final judgment is the subject of the appeal, a technical defect in the notice of appeal is not fatal (citations omitted).

*Greenwood*, 974 F.2d at 1467 n.13 (emphasis in original); *see also* 9 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 203.17[2], at 86-87 (2nd ed. 1996) ("[A]s long as the intent to appeal from a specific judgment can be fairly inferred from the notice and the appellee is not misled by the mistake," the jurisdiction of the appellate court is not barred by mistake in notice of appeal.).

Here, we find that O'Keefe was put on notice by the government's notice of appeal and that he was not prejudiced by the misstatement in the notice of appeal. First, appeal of an order granting new trial can be fairly inferred from a notice appealing denial of reconsideration of that order because the connection between the two is clear and direct. *See Matute v. Procoast Nav. Ltd.*, 928 F.2d 627, 629 (3rd Cir. 1991) (finding link between an order of dismissal and an order denying motion for reconsideration of the order of dismissal to be clear and direct). Moreover, both the government and O'Keefe fully briefed the merits of this appeal, which would imply that O'Keefe was both on notice that the government intended to appeal the order granting new trial and that he was not prejudiced as a result of the misstatement in the government's notice of appeal. *See, e.g., Foman v. Davis*, 371 U.S. 178, 181-82, 83 S. Ct. 227, 229-30, 9 L.Ed.2d 222 (1962); *Kruso v. International Tel. & Tel.*, 872 F.2d 1416, 1423 (9th Cir. 1989).

-8-

The order granting new trial and the motion for its reconsideration are also inextricably linked because we cannot analyze whether the district court abused its discretion in denying the motion for reconsideration without considering the merits of the order granting new trial. Thus, as the government's intent to appeal the order granting new trial can be fairly inferred from its noticing the district court's denial of reconsideration of that order, and as O'Keefe was not prejudiced by the misstatement, the mistake in the notice of appeal does not bar our exercising jurisdiction in this case.[4]

B

The government argues that Judge Sear erred in failing to enforce his recusal and in denying the motion for reconsideration.[5]

---

[4]    O'Keefe alternatively argues that noticing the motion for reconsideration without mentioning the order granting new trial resulted in the government waiving appeal on the issue of the order granting new trial. A notice of appeal "must designate the judgment, order, or part thereof appealed from." FED. R. APP. P. 3(c). While a policy of liberal interpretation of notices of appeal is the rule when the intent to appeal an unmentioned or mislabeled ruling is clear and no prejudice will result to the opposing party, when only a specified judgment or part thereof is noticed, the notice of appeal is generally strictly construed. *See C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1055–56 (5th Cir. 1981). We found above that O'Keefe clearly had notice that the government intended to appeal from the order granting new trial when it appealed from the denial of the reconsideration of that order and that no prejudice would result to O'Keefe because the merits of this case were fully argued in the briefs he presented to this court. Accordingly, we hold that the government did not waive its appeal of the order granting new trial as a result of any defects in its notice of appeal.

[5]    Chief Judge Sear stated that

  [b]ecause of the sensitive nature of the court's inquiry concerning conduct of government counsel, the court's personal participation and questioning of counsel in

-9-

O'Keefe argues that Chief Judge Sear properly refused to enforce the recusal because, quite simply, Judge Lemmon could not reconsider what Judge Lemmon had not considered in the first place.

Once a judge recuses himself from a case, the judge may take no action other than the ministerial acts necessary to transfer the case to another judge, even when recusal is improvidently decided. *See Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 457 (5th Cir. 1996) (holding that judge erred in vacating recusal order after recusing herself); *Moody v. Simmons*, 858 F.2d 137, 143 (3rd Cir. 1988) (stating that judge may only perform the "housekeeping" duties necessary to transfer a case to another judge after recusing himself from a proceeding).  A ministerial act is usually defined as an act that is essentially clerical and does not involve the exercise of discretion or judgment.  *See United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420, 51 S. Ct. 502, 504, 75 L.Ed.2d 1148 (1931) (describing a ministerial duty as one in which "the obligation to act [is] peremptory, and plainly defined"); *Moody*, 858 F.2d at 143 (holding that orders converting Chapter 11 bankruptcy to Chapter 7 bankruptcy, disqualifying counsel, vacating a contingent fee agreement, and making findings attacking counsel exceeded "housekeeping" orders).  A district court necessarily has discretion as to whether to reopen a case in response to a motion

---

connection with that inquiry, and the findings of the court resulting from that inquiry, the court feels compelled to recuse itself from further handling of this matter in accordance with 28 U.S.C. § 455.

*United States v. O'Keefe*, No. 96-31181, at 71 (E.D. La. Aug. 15, 1996) (order granting new trial) (hereinafter "Order").

-10-

for reconsideration.  *See Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 174 (5th Cir. 1990).  Thus, when Chief Judge Sear ruled on the motion for reconsideration, he performed a discretionary act, not a ministerial act.

O'Keefe (as Chief Judge Sear noted below) essentially argues that an exception from the bright-line rule for recusals described above should be created for motions for reconsideration because a judge cannot reconsider what that judge has not considered previously.  Toward this end, O'Keefe cites *McRae v. United States*, 420 F.2d 183 (D.C. Cir. 1969), for the proposition that a district court judge cannot reconsider matters previously decided by another district court judge, and that the proper method for resolution of this situation is appeal to a higher court.  This argument ignores the many instances in which one district court judge must reconsider an order previously granted by another judge because of the first judge's death, illness, or disqualification. *See TCF Film Corp. v. Gourley*, 240 F.2d 711, 714 (3rd Cir. 1957).  It also overlooks the law of the case doctrine, which encompasses situations in which one judge has rendered an order or judgment and the case is then transferred to another judge.  *See Abshire v. Seacoast Products*, 668 F.2d 832, 838 (5th Cir. 1982).  Under the law of the case doctrine and general principles of comity, a successor judge has the same discretion to reconsider an order as would the first judge, but should not overrule the earlier judge's order or judgment merely because the later judge might have decided matters differently.  *See Loumar, Inc. v. Smith*, 698 F.2d 759, 762-

-11-

63 (5th Cir. 1983) (stating that under the law of the case doctrine, a second court should follow a ruling made by an earlier court unless the prior decision was erroneous, is no longer sound, or would create injustice).  Thus, even though Judge Lemmon did not consider the new trial motion initially, Judge Lemmon would have been able to consider the motion for reconsideration and, as such, Chief Judge Sear erred when he ruled on the motion for reconsideration.[6]

C

The "harmless error" standard is used to determine whether orders that a judge issues after the judge has, or should have, recused himself must be vacated.  *See Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 862, 108 S. Ct. 2194, 2203, 100 L.Ed.2d 855 (1988); *Doddy*, 101 F.3d at 458;  *El Fenix de Puerto Rico v. The M/Y Johanny*, 36 F.3d 136, 142 (1st Cir. 1994)

---

[6]    We recognize that our ruling today may put one district judge in the somewhat uncomfortable position of having to pass judgment on the discretionary rulings of another judge in the future.  However, the values underlying 28 U.S.C. § 455, including "protecting the litigants' constitutional entitlement to an unbiased adjudication and the public's perception of the integrity of the judicial process" demand no less.  *See Doddy*, 101 F.3d at 457.   Judges have, moreover, under law of the case doctrine experience reviewing the discretionary rulings of other judges, and we are confident that they will be able to carry out any additional duties resulting from our ruling today.  A contrary result, we believe, would mean that when a judge has to recuse himself, the parties lose the option of filing a motion for reconsideration, something that we are not inclined to find, both because of the impact on the parties and because reconsideration may obviate the need to appeal. *See Greenwood*, 974 F.2d at 1466. No such problem exists in this case, of course, as we vacate the order granting new trial and only remand for Judge Lemmon to hear O'Keefe's remaining arguments for new trial that Chief Judge Sear declined to decide after he granted a new trial based on the deprivation of due process.

-12-

(concluding that "the need for finality and a common-sense aversion to frittering away scarce judicial resources militate against an inflexible rule invalidating all prior actions of a judge disqualified under § 455(a)"). Under the "harmless error" test, we examine: (1) the risk of injustice to the parties in this particular case, (2) the risk that denial of relief will produce injustice in other cases, and (3) the risk of undermining the public's confidence in the judicial process. *See Liljeberg*, 486 U.S. at 864, 108 S. Ct. at 2205; *Doddy*, 101 F.3d at 458. As we explain below, we conclude that it is unnecessary to vacate Chief Judge Sear's ruling and remand for Judge Lemmon to rule on the motion for reconsideration because Chief Judge Sear's ruling on the motion for reconsideration was harmless error.[7]

Applying the three-part harmless error test, we first note that little risk of injustice to the parties will result from not vacating the denial of the motion for reconsideration and remanding for reconsideration by Judge Lemmon. The record is sufficient for us to review the order granting new trial. Our review of the order granting a new trial and the denial of the motion for reconsideration under an abuse of discretion standard, *United*

---

[7]    Another option is also available: we could hold the appeal in abeyance and remand the motion for reconsideration to Judge Lemmon for her to rule on the motion for reconsideration. In the event that Judge Lemmon vacated the order granting new trial, this appeal would then become moot. Although our decision in *Greenwood* could arguably be read to endorse such an approach, *see Greenwood*, 974 F.2d at 1469, as the record in this case is fully developed, very little would be gained by remanding and waiting for the district court's ruling on reconsideration rather than reviewing the order granting new trial ourselves now.

*States v. Pankurst*, 118 F.3d 343, 353 (5th Cir. 1997), is only slightly more deferential than a district court's review under the law of the case doctrine. *See Abshire*, 688 F.2d at 837 (holding that a successor judge should generally treat an order in a case transferred by another judge with deference). Moreover, were we to vacate Chief Judge Sear's order denying the motion for reconsideration, then the motion for reconsideration would still be pending, and we would have to remand for Judge Lemmon to rule on that motion. *See Southland Indus. v. Federal Communications Comm'n*, 99 F.2d 117 (D.C. Cir. 1938) (holding that a decision is not final until an application for reconsideration has been decided). Although the need for an appeal to this court might well be obviated by Judge Lemmon's decision, it is also possible that Judge Lemmon might deny the motion for reconsideration, which would then produce yet another appeal on the merits of the appeal now before us. Further, both the government and O'Keefe have fully discussed the merits of this case in their briefs, which, when considered together with the other facts we adduced above, leads us to conclude that neither party would be prejudiced by our deciding the merits of this appeal without remanding to Judge Lemmon for a ruling on the motion for reconsideration.

Second, our decision today aids, rather than prejudices justice in other cases because it clarifies an unclear area of the law and serves as a caution to district court judges of the importance of taking no discretionary actions after recusal. It was not until 1984 that 18 U.S.C. § 3731 was amended to permit the

government to appeal the interlocutory grant of a new trial. PUB. L. NO. 98-473, § 1206, 98 Stat. 1986 (1984) (codified at 18 U.S.C. § 3731). *Liljeberg*, which established the three-part harmless error standard for review of decisions made by a judge after recusal becomes appropriate, was not decided until 1988. *Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 108 S. Ct. 2194, 100 L.Ed.2d 855 (1988). *Moody*, the first major case concluding that a judge could take no action after recusal other than to perform ministerial acts, was decided in the same year, and we only reached the same conclusion in December of 1996, after Chief Judge Sear had denied the reconsideration motion in this case. *Doddy v. Oxy USA, Inc.*, 101 F.3d 448 (5th Cir. 1996); *Moody v. Simmons*, 858 F.2d 137 (3rd Cir. 1988). Thus, our decision today aids justice in other cases by alerting judges to the importance of taking no further discretionary actions after recusal.

Finally, there is little risk of undermining the public's confidence in the judicial process. While in some cases vacation of orders issued by a judge will restore public confidence in the legal system, *see United States v. Jordan*, 49 F.3d 152 (5th Cir. 1995), other courts have held that decisions that are based on technicalities and do not reach the merits of the case increase public distrust of the legal system. *See Parker v. Connors Steel Co.*, 855 F.2d 1510, 1527 (11th Cir. 1988). A pragmatic approach should be taken to the notion of harmless error so that when in doubt, a court can reach the merits of an appeal. *See, e.g., Brown Shoe Co. v. United States*, 370 U.S. 294, 306, 82 S. Ct. 1502, 1513,

8 L.Ed.2d 510 (1962) (stating that "[a] pragmatic approach to the question of finality has been considered essential to the achievement of the 'just, speedy, and inexpensive determination of every action'" (quoting FED. R. CIV. P. 1)).  Accordingly, we hold that Chief Judge Sear's ruling on the motion for reconsideration after recusal was harmless error and does not have to be vacated. The result of this conclusion is that with all of the challenges to our jurisdiction cleared away, we now proceed to a resolution of this appeal on the merits.

III

    "[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. . . . The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). A *Napue* violation may occur not only when the prosecuting attorney knows that a witness's testimony is false, but also when another government attorney knows of the false testimony and does nothing to correct it.  *See Giglio v. United States*, 405 U.S. 150, 153, 92 S. Ct. 763, 766, 31 L.Ed.2d 104 (1972).  False testimony for these purposes includes testimony that affects only the credibility of a witness.  *Napue*, 360 U.S. at 269-270, 79 S. Ct. at 1177.  Thus, the grant of a new trial based upon a *Napue* violation is proper only if (1) the statements in question are shown to be actually false; (2) the prosecution knew that they were false; and (3) the statements

-16-

were material. *United States v. Blackburn*, 9 F.3d 353, 357 (5th Cir. 1993).  On appeal, the government argues that none of these three elements exists.

We review an order granting new trial under an abuse of discretion standard.  *United States v. Pankurst,* 118 F.3d 345, 353 (5th Cir. 1997).  This standard is necessarily deferential to the trial court because we have only read the record, and have not seen the impact of witnesses on the jury or observed the demeanor of the witnesses ourselves, as has the trial judge.  *See United States v. Boyd*, 55 F.3d 239, 242 (7th Cir. 1995).  Questions of law, however, are reviewed *de novo*.  *Munn v. Algee*, 924 F.2d 568, 575 (5th Cir. 1991).  On mixed questions of law and fact, we review the underlying facts on an abuse of discretion standard, but the conclusions to be drawn from those facts *de novo*.  *Ornelas v. United States*, __ U.S. __, 116 S. Ct. 1657, 1662, 133 L.Ed.2d 334 (1996).  The *Napue* test))specifically the issue of materiality))is just such a mixed question of law and fact, and so we undertake an independent appellate analysis to determine whether the facts found by the trial court rise to the level of the applicable legal standard.[8]

---

[8]     As the Supreme Court noted in *Ornelas*, "[i]ndependent review is therefore necessary if appellate courts are to maintain control of, and to clarify the legal principles." *Id*. at __, 116 S. Ct. at 1662. Thus, while perforce we agree with the Seventh Circuit's conclusion in *Boyd* that deference should be given to the district court's finding of facts, we would be remiss in our duty as an appellate court if we did not decide whether those facts satisfied the applicable legal standard.  *See also Miller v. Fenton*, 474 U.S. 104, 114, 106 S. Ct. 445, 451, 88 L.Ed.2d 405 (1985) (When the "relevant legal principle can be given meaning only through its application to the particular circumstances of a

The Supreme Court has recently defined materiality in terms of a "reasonable probability" of a different outcome. *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). Such a reasonable probability results when nondisclosure places the case in a different light so as to undermine confidence in the verdict. *Id*. at 435, 115 S. Ct. at 1566. The relevant inquiry examines the challenged evidence collectively, not on an item-by-item basis. *Id*. at 436, 115 S. Ct. at 1566-67. "To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record." *Yates v. Evatt,* 500 U.S. 391, 403, 111 S. Ct. 1884, 1893, 114 L.Ed.2d 705 (1991).

It is axiomatic that not every lie is material. Along with other circuits, we have limited material lies to those that occur as a part of the prosecution's case. *See Hudson v. Blackburn*, 601 F.2d 785, 789 (5th Cir. 1979)*; see also United States v. Aichele*, 941 F.2d 761, 766 (7th Cir. 1991) (applying same rule). The prosecution has a duty only to "refrain from knowingly presenting perjured testimony and from knowingly failing to disclose 'that testimony used to convict a defendant was false.'" *Aichele*, 941 F.2d at 766 (quoting *United States v. Endicott*, 869 F.2d 452, 455 (9th Cir. 1989)). Thus, when the defense elicits the alleged perjury on cross-examination, no material falsehood has occurred

---

case, the Court has been reluctant to give the trier of fact's conclusions presumptive force, and in so doing, strip a federal appellate court of its primary function as an expositor of law.").

because the government has not itself knowingly presented false testimony. *Id.* We have adopted this position because it is the duty of the jury to determine the credibility of the witnesses. *See Little v. Butler*, 848 F.2d 73, 76 (5th Cir. 1988) (stating that "prosecutors are seldom able to vouch for their [accomplice witnesses'] credibility" and that courts should instruct juries to carefully scrutinize the testimony of such witness). Materiality, stated another way, occurs when the falsehood results in "a corruption of the truth-seeking function of the trial process." *United States v. Agurs,* 427 U.S. 97, 104, 96 S. Ct. 2392, 2397, 49 L.Ed.2d 342 (1975); *United States v. Meinster*, 619 F.2d 1041, 1042 (4th Cir. 1980) (holding that underlying purpose of *Napue* and *Giglio* is not to punish prosecutor for the misdeeds of a witness, but rather to ensure that jury is not misled by any falsehoods).

Not all falsehoods are material partially because of our concern with preserving the adversarial system: it is the prerogative of defense counsel to plan his or her cross-examination strategy, and undue clarification or interruption by the prosecution might interfere with that strategy. *See Mills v. Scully*, 826 F.2d 1192, 1196 (2nd Cir. 1987). Thus, courts have been extremely reluctant to find a deprivation of due process when the prosecution has provided the defense with the necessary information and it can utilize the information, but decides, for tactical reasons, not to use such information. *See United States v. Bethley*, 973 F.2d 396, 399 (5th Cir. 1992) (rejecting claim of *Napue* violation when government provided defendant with witness's

-19-

rap sheets and plea agreement in related case and defendant's counsel failed to ask question regarding witness's denial of past convictions). However, even when the defense is aware of the falsity of the testimony, a deprivation of due process may result when the information has been provided to the defense but the government reinforces the falsehood by capitalizing on it in its closing argument, *see United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977), or the defense is unable to utilize the information, *see id.* at 178-79, or when the government thereafter asks misleading questions, *United States v. Barham*, 595 F.2d 231, 243 n.17 (5th Cir. 1979). Thus, materiality is a method of maintaining the equal playing field between the prosecution and the defense necessary to allow the jury to perform its truth-seeking function.

The trial court concluded that although some of Donaldson's falsehoods were revealed to the jury, the "true nature and scope of Donaldson's perjury was never disclosed or corrected by the government, or revealed on cross-examination by the defendants." Order at 71. The nature and scope of these falsehoods went unrevealed because the government never stated until after trial why it amended the indictment against O'Keefe, why it permitted the cross-examination of Donaldson to go forward with the FBI 302 report that it knew to be incorrect, and why the two prosecutors gave inconsistent answers as to when they learned of the falsehoods. The long, drawn-out pauses before Donaldson answered the defense's questions during the critical cross-examination

colloquy also supported the inference that Donaldson had previously told the government about his false accusation of O'Keefe. Further, the court found that the government improperly bolstered the credibility of Donaldson on redirect and during its closing argument by eliciting testimony that even though O'Keefe had not participated in the alteration of the minutes, he had knowingly incorporated them into an affidavit presented to a Louisiana state court. Finally, the court concluded that the prosecution thought that the testimony concerning the minutes was material because it had changed the indictment in an attempt to cover up the falsehood and to mislead defense counsel. On appeal, the government argues that all of Donaldson's falsehoods were revealed to the jury, and that even if they were not, those falsehoods were not material to the jury's verdict because Donaldson's testimony was overwhelmingly corroborated by other evidence and witnesses.

We first believe that the trial court abused its discretion when it made the factual finding that the government changed the indictments in an attempt to mislead the defense. This factual finding was an abuse of discretion because whether or not the government attempted to mislead the defense, the defense had too much knowledge of the minutes to be misled. The record shows that defense counsel and the government conferred prior to trial regarding the indictment as a result of various pretrial motions made by the defense contesting the statement in an earlier version of the indictment charging that O'Keefe had knowingly included the false minutes in an affidavit he presented to a Louisiana state

-21-

court.  The order granting new trial itself notes that the defense took depositions concerning the minutes and strongly contested the charge in the indictment concerning O'Keefe's knowing incorporation of the minutes into the affidavit.  The government sent the defense a letter conceding that Donaldson had altered the minutes by himself.[9]  Therefore, this indictment change and the documents provided to the defense, when combined with the FBI 302 report, put defense counsel on notice of possible falsehoods or inconsistencies uttered in the past by Donaldson, even if the defense did not know the precise reason the indictment was changed.  As a result, we hold that the district court abused its discretion by finding that the prosecution altered the indictment in an attempt to mislead the defense because even if the prosecution made such an attempt, the defense had too much knowledge of the minutes to be misled.

With respect to the district court's legal conclusion of materiality, falsehoods, to the extent that any were uttered, occurred as a result of the defense's cross-examination, not from testimony elicited by the prosecution.  Once those falsehoods emerged, the defense had total leeway in cross-examining Donaldson and used the information provided by the prosecution to powerful

---

[9]    Affidavits by both government prosecutors in this case and other members of the prosecutorial team state that the indictment was republished to narrow the issues in contention, not to mislead the defense.  These affidavits are part of the record on appeal, FED. R. APP. P. 10(a), because they were included with the government's reconsideration motion. In light of Chief Judge Sear's specific refusal to find that the government attorneys either suborned perjury or committed misconduct, these affidavits are one piece of evidence to be considered in deciding whether the government attempted to mislead the defense by republishing the indictment.

effect. *See United States v. Adebayo*, 985 F.2d 1333, 1341-42 (7th Cir. 1993) (rejecting *Napue* claim when false testimony was elicited by defense counsel on cross-examination because the false testimony was not part of government's case, defense counsel had total leeway to cross-examine witness, and jury instructions included cautionary statement). A review of the cross-examination set out in the margin above gives little doubt that the defense ably exploited the FBI 302 report that the government provided to the defense prior to Donaldson's direct testimony and which provided the basis for the defense's devastating cross-examination of Donaldson. Even if it is contended that the government had a duty to correct any falsehoods made during the course of this cross-examination that were not corrected by the concessions that Donaldson himself made, any attempt by the prosecution to intercede during this cross-examination would have actually harmed the defense by depriving the jury of the full, dramatic effect. *See United States v. Brand*, 80 F.3d 560, 565-66 (1st Cir. 1996) (holding that government had no duty to correct false statement by key witness denying promise of leniency in exchange for testimony because of clarifying admissions by witness in presence of jury). There were also contemporaneous attempts by the government to explain the inconsistencies in Donaldson's testimony during sidebar conferences, although we agree with Chief Judge Sear that those explanations were unsatisfying.

We find that the falsehoods were sufficiently exposed before the jury to enable the jury to weigh those falsehoods in its deliberations. Defense counsel moved, immediately after Donaldson

-23-

left the stand, to have his entire testimony stricken from the record, but Chief Judge Sear refused, stating that Donaldson's credibility was for the jury to decide. Defense counsel then made impeachment of Donaldson the centerpiece of their closing arguments.[10] Chief Judge Sear also included a strong cautionary statement in the jury instructions. Thus, the jury knew that Donaldson had lied either when he stated that he had not previously falsely accused O'Keefe of participating in the alteration of the minutes or when he stated that he had accused O'Keefe of participating in altering the minutes. The jury was also able to

---

[10] The various defense counsel representing the various defendants made the following statements in the course of their closing arguments:

Attorney Ashley: Is it inconceivable, as you sit there, ladies and gentlemen, that after Charles Donaldson lied to this litany of people, including a federal judge, a federal prosecutors, is it inconceivable that he lied to these folks? . . . No, it's not inconceivable at all.

Attorney Martzell: Mr. Donaldson. I made a little calculation of the legal experience of the people on this side of the bench. I have not included the Judge's years at the bar. Something over 200 years of legal experience sitting out here. I guaranty, none of us ever have in the past or will have the unique experience that we had here of having a man admit under oath that he falsely accused one of the Defendants and didn't tell the government about it.

Attorney Simmons: And it's been suggested that he didn't lie before you. When you go back there and you can deliberate any way you want, but see if you've been mislead by Mr. Donaldson. What were you thoughts at the time direct testimony was over? Starting to sound credible? What were your thoughts after cross-examination? Incredible. You were mislead. You were mislead hand-in-hand with the Prosecution. The question is whether they may know about it, but you were mislead by at least Mr. Donaldson.

evaluate the long, drawn-out pauses before Donaldson answered the defense's questions. *See United States v. Grosz*, 76 F.3d 1318, 1328 (5th Cir. 1996) (stating that sufficient exploration and correction of a falsity by the defense may render the falsehood immaterial by negating reliance on the falsehood by the jury). Accordingly, we find that the disclosure to the jury of Donaldson's falsehoods coupled with the prosecution's disclosures to the defense prevented those falsehoods from being material because enough information was provided to the jury to enable them to adequately perform their fact-finding function and to maintain the level playing field between the prosecution and the defense.[11]

Defense counsel argued in their motion for new trial and before us that they would have proceeded differently, that they would have attempted to impeach the government as well as Donaldson and would have discussed how the factual basis for the guilty plea was selected, had they known the full facts surrounding Donaldson's

---

[11] This finding that the falsehoods were not material is not negated by the prosecution's half-hearted attempt to bolster the credibility of Donaldson on redirect and in closing arguments. Any such bolstering as may have occurred does not rise to the level of bolstering in cases where we have reversed the denial of a new trial. *See Sanfilippo*, 564 F.2d at 178-79. Moreover, we do not disagree with the trial court's conclusion that the government was aware of Donaldson's falsehoods prior to trial based on the inconsistent answers of the two government prosecutors as to when they were aware that Donaldson had testified falsely. We think that even if the government had such knowledge prior to trial, Donaldson's falsehoods were not material as a matter of law because the falsehoods were fully explored before the jury. Finally, the significance of the long, drawn-out pauses before Donaldson answered O'Keefe's questions during the critical cross-examination colloquy is precisely the kind of issue that the jury can weigh, and should not be a basis for a deprivation of due process based on the government's knowing use of false testimony.

false testimony at the time.  We disagree on several counts. First, the defense repeatedly characterized Donaldson as being completely impeached during its closing arguments.  Second, the testimony of Donaldson was overwhelmingly corroborated by other witnesses, and the falsehoods occurred on collateral matters. *See Kopycinski v. Scott*, 64 F.3d 223, 226 (5th Cir. 1995) (holding that when withheld evidence seriously impeaches key witness's testimony on an essential issue, corroborating evidence should be examined to determine materiality of alleged falsehood).  Although it is immaterial whether the falsehood concerns an essential element of the government's case or only a collateral matter affecting credibility, *United States v. Barham*, 595 F.2d 231, 241 (5th Cir. 1979), given the degree of impeachment of Donaldson on the stand, any further impeachment of the type that the defense now desires would merely have been cumulative.  *See Guam v. Palomo*, 35 F.3d 368, 372 (9th Cir. 1994) (finding an alleged falsehood nonmaterial when "additional impeachment value gained would have served only to emphasize a fact already established on cross-examination"). Third, although the burden to correct false testimony is on the government, the defense may have waived impeachment of the government by not calling FBI Agent Phillips, the author of the notes on which the FBI 302 report was based and who was present in court at various times. *See Bethley*, 973 F.2d at 399.  Finally, Chief Judge Sear indicated that he was prepared to deny the motion for new trial prior to argument on the motion, but the answers of government attorneys at that argument convinced him otherwise.  The

-26-

affidavits of both government attorneys and other members of the prosecutorial team that the government attached to its motion for reconsideration, in the absence of a finding of prosecutorial misconduct, suggest that the government's answers at the argument of the motion for new trial were inartful but not duplicitous.

A review of cases finding a violation of *Napue* shows that the falsehoods in those cases have usually been far more serious than those that occurred in this case. We have found a violation of *Napue* in cases when there was a material discrepancy between the testimony of government witnesses and defense witnesses, the government was aware that its witnesses committed perjury on the stand but such perjury was not disclosed to the jury, and the credibility of the witnesses was the key to the jury's determination of guilt or innocence. *Barham*, 595 F.2d at 242-43. We reversed because not only was the jury shielded from the fact that the witnesses had committed perjury, but it was also shielded from the fact that the witnesses had attempted to manipulate the jury's decision-making process by creating a false impression. *Id*. at 243. Even in such an apparently egregious situation, we were still loath to grant a new trial. We found that the government had provided defense counsel with a letter disclosing the plea bargains that the witnesses had entered into, but that the counsel had inexcusably overlooked the letters. While such disclosure would normally have been sufficient to prevent a *Napue* violation, the government's posing of misleading questions to the witnesses negated its disclosure, and *that* created the deprivation of due

-27-

process.  *Id*. at 243 n.17.

The grant of a new trial is necessarily an extreme measure, because it is not the role of the judge to sit as a thirteenth member of the jury.  *See State v. Ladabouche*, 502 A.2d 852, 856 (Vt. 1985) (stating that such a formulation would allow the judge to order a retrial when he disagreed with the outcome).  The judge's job, in connection with an alleged *Napue* violation, is to grant a new trial when the fact-finding function of the jury has been corrupted by a material falsehood of which the government was aware.  Based on the facts of this case, we cannot find that the jury was prevented from performing its essential function.  Therefore, we do not find that there is a reasonable probability that the jury would have reached a different outcome even had it been fully aware of all of the alleged inconsistencies and falsehoods in Donaldson's testimony. As a result, the falsehoods were not material and no *Napue* deprivation of due process occurred.

IV

Although we find that no violation of *Napue* occurred, we will nevertheless uphold the district court's order granting new trial if it is in the "interests of justice." FED. R. CRIM. P. 33.  These "interests of justice" may be based on the trial judge's evaluation of witnesses and weighing of the evidence.  *See Tibbs v. Florida*, 457 U.S. 31, 37-38, 102 S. Ct. 2211, 2215-16, 72 L.Ed.2d 652 (1982).  Although grant or denial of the motion is entrusted to the sound discretion of the judge, motions for new trial are not favored, and are granted only with great caution.  *United States v.*

-28-

*Hamilton*, 559 F.2d 1370, 1373 (5th Cir. 1977). "The remedy of a new trial is rarely used; it is warranted 'only where there would be a miscarriage of justice' or 'where the evidence preponderates heavily against the verdict.'" *United States v. Andrade*, 94 F.3d 9, 14 (1st Cir. 1996). Chief Judge Sear principally based the grant of new trial on the finding of a violation of *Napue*, but this finding was reinforced by the delayed release of FBI 302 reports (for both Donaldson and Moore) to the defense, the "cloud" cast over the testimony of Moore by the changes in his testimony, and the prosecution's attempt to mislead the defense by changing the indictment. Without the *Napue* violation, we hold that it was an abuse of discretion to grant a new trial based on these findings.

First, the trial court noted that the FBI 302 reports were provided to the defense within the time mandated by the Jencks Act,[12] 18 U.S.C. § 3500 *et seq*., but stated that it could not "conclusively find that the production of the reports during trial did not adversely affect the court's ability to reach a just conclusion, particularly in light of the government's conduct in connection with the FBI 302 reports of Charles Donaldson." Order, at 54. The argument is not that the government suppressed evidence, *see Brady v. Maryland*, 373 U.S. 83, 104, 83 S. Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963), but that the disclosure of the

_____

[12] The Jencks Act requires the government to produce any statements made by a witness concerning the subject matter on which the witness has testified that are in the possession of the government after the witness has testified on direct examination in a criminal trial prosecuted by the federal government. 18 U.S.C. § 3500(b); FED. R. CRIM. P.26.2.

-29-

reports was so delayed that the defendants were unable to use them effectively at trial and the court's ability to reach a just result was impaired. *See United States v. Campagnulo*, 592 F.2d 852, 861-62 (5th Cir. 1979). When evidence is disclosed at trial in time for it to be put to effective use, a new trial will not be granted "simply because it [the *Brady* evidence] was not disclosed as early as it might have and, indeed, should have been." *United States v. McKinney*, 758 F.2d 1036, 1050 (5th Cir. 1985). Moreover, even if the disclosure of *Brady* material was impermissibly delayed, such evidence must still be found to be material. *See Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 1567, 131 L.Ed.2d 490 (1995).

In this case, the government submitted the FBI 302 report of Moore to the court for an *in camera* review after cross-examination had begun, following which the court gave the report to the defense. Trial was recessed for the remainder of that day to allow the defense time to prepare. Donaldson's FBI 302 report was turned over to the court for *in camera* review prior to the beginning of his direct testimony, and the court then handed it over to the defense. During the more than one day of Donaldson's testimony, the defense was able to review the testimony. Although turning these reports over to the defense earlier would have certainly avoided the delays during trial, based on our review of the record and the absence of any affirmative finding (other than the conclusion) by Chief Judge Sear that the delayed disclosure of the reports may have impaired O'Keefe's ability to effectively cross-examine Donaldson and Moore, we cannot find that the delayed

disclosure of the FBI 302 reports violated *Brady*. *See Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994); *United States v. Randall*, 887 F.2d 1262, 1269 (5th Cir. 1989); *McKinney*, 758 F.2d at 1050. As we have extensively discussed above, O'Keefe's attorneys used Donaldson's FBI report to conduct a devastating cross-examination. Defense counsel were also able to bring out inconsistencies in Moore's testimony as well, although he did not perjure himself. Thus, without viewing the delayed disclosure in the light of a *Napue* violation, we find that this basis for new trial has little merit.

Next, the district court also found that the changes in the testimony of Moore, another key government witness, cast a cloud over his testimony, which, when viewed "in light of the circumstances surrounding Donaldson's testimony," supported the grant of a new trial. However, Chief Judge Sear also found that O'Keefe could not point to any specific instances of perjury by Moore, and that the changes in Moore's testimony provided ample grounds for cross-examination. No violation of *Napue* was alleged in connection with Moore's testimony, and these inconsistencies were explored before the jury on cross-examination. Further, Chief Judge Sear separately considered the inconsistencies in Moore's testimony as the basis for a new trial in another part of the order granting new trial and concluded that the claims of O'Keefe with regard to Moore's testimony lacked merit. Thus, without being viewed in the light of a *Napue* violation, this basis for new trial also has little merit.

Finally, the district court found that the prosecution's attempts to mislead defense counsel by altering the indictment, in light of Donaldson's testimony at trial, supported granting a new trial. We have already discussed the changes in the indictment, and have found that the district court abused its discretion in finding that the government attempted to mislead the defense by redrafting the indictment because the prominence of the minutes in pretrial proceedings made it impossible for the government to have misled the defense. Thus, this basis for new trial has little merit.

Viewed as a whole, each of these three findings of the court primarily relied upon the finding of a *Napue* violation because each finding was discussed "in light of" the *Napue* violation. Taking away the finding of a violation of *Napue*, we are unable to conclude that the remaining grounds for grant of new trial meet our past standards for grant of new trial or would be in the "interests of justice." Thus, we conclude that Chief Judge Sear abused his discretion in granting a new trial. Accordingly, we vacate the order granting a new trial.[13]

V

When Chief Judge Sear granted the motion for new trial, he declined to address O'Keefe's remaining arguments for new trial, which included arguments based on the government's voluntary dismissal of five counts from the indictment after the government

_____

[13] In light of our vacation of the order granting new trial, we decline to address arguments concerning whether the grant of new trial should include Schmitz.

had concluded its case, the alleged "marginal" nature of the evidence, and the cumulative effect of all the grounds asserted in all other defense motions. We accordingly remand to the district court to hear these remaining arguments for new trial.

The government has suggested that if a remand is needed, the case should be remanded to a judge outside the Eastern District of Louisiana, relying on *United States v. Jordan*, 49 F.3d 152, 159-160 (5th Cir. 1995) (remanding case involving judicial disqualification to district court outside original district). Such a remedy is discretionary, and the exception rather than the rule. *See id*. at 162 n.21 (Garza, Emilio, J., dissenting). It seeks to avoid placing a district judge's colleagues in the uncomfortable position of passing on her previous rulings. *Id*. at 160 n.18. In *Jordan*, the judge abused her discretion by failing to recuse herself prior to sentencing the defendant after recusal had become appropriate under § 455(a). *Id*. at 158. Here, we have already vacated the order granting new trial, and Judge Lemmon will only review O'Keefe's remaining arguments for new trial, which does not require her to pass judgment on any of Chief Judge Sear's discretionary rulings. In addition, the law of the case doctrine and general principles of comity serve to respect and preserve the authority of Chief Judge Sear. *See, e.g.*, *Loumar v. Smith*, 698 F.2d 759, 762 (5th Cir. 1983); *Abshire v. Seacoast Prod., Inc*., 668 F.2d 832, 837 (5th Cir. 1982). Therefore, we remand the case to Judge Lemmon.

For the foregoing reasons, the order granting new trial is VACATED, and the case is REMANDED to Judge Lemmon to hear O'Keefe's

remaining arguments for new trial.  The government's motion to remand this case to a court outside the Eastern District of Louisiana is DENIED.