Judge Roland L. Belsome
| Robert Murray appeals his convictions and sentences for conspiracy to commit armed robbery with a firearm and armed robbery. Murray was sentenced to ten years on each count. He also appeals the trial court’s denial of his Motion for New Trial. For the reasons that follow, we reverse the denial of the motion for new trial and remand.
STATEMENT OF THE CASE
In November 2012, the State filed a bill of information charging Robert Murray with one count of armed robbery with a firearm and one count of conspiracy to commit armed robbery with a firearm. The State also charged Trent Mackey and Julian Haynes as Murray’s co-defendants. In February 2013, the trial court granted the motion to sever trial for Mackey and Haynes.
Murray pled not guilty to all charges. The trial court found probable cause and denied his Motions to Suppress Identification and Statement. In June 2013, Murray *568 proceeded to a jury trial. He was convicted by a unanimous jury on both charges. Mackey was found not guilty in July 2013, after a jury trial, and the State ^subsequently entered a nolle prosequi as to the charges against Haynes in August 2013.
Murray filed a motion for new trial in August 2013. In January 2016, he filed a Supplemental Motion .for New Trial and a Motion for Judgment Notwithstanding the Verdict for the conspiracy conviction.
The trial judge denied all post-trial motions, defense counsel waived delays and the trial court sentenced Murray to ten years on each count to run concurrently, with credit for time served. This appeal followed.
ASSIGNMENTS OF ERROR
Murray presents two assignments of error on appeal. First, he complains that the evidence is insufficient to prove his identity as a participant in the charged crimes. Second, he asserts • that the ■ trial court erred'in denying his Motion for New Trial as newly discovered evidence demonstrates that the State’s key witness against him committed perjury at trial.
FACTUAL BACKGROUND
In July 2012, Megan Wales called the police to report that she and her friend and co-worker Trent Mackey had been robbed at gunpoint by two men who had broken into her apartment on Broadway Avenue in New Orleans. She told the police that she heard noises outside, and when she opened the door to check two men burst into her apartment; one held a gun to her head and ordered her to. lie down on the floor and ordered Mackey to face the wall. She reported that the men Ustole her cellphone, purse and laptop, and Mackey’s cellphone; before they fled on foot.
Wales told police that she chased the robbers down Broadway Avenue while Mackey left the scene in his truck. She stated that when she caught up with the assailants and demanded her items back, they gave her back her phone and computer, but kept the other items. Wales described the assailants as medium-complected black'males, between- eighteen and twenty years old, approximately 5’8‘ to 5’10‘ in height, with clean haircuts.
On the day of the robbery, Detective Swalm canvassed the neighborhood for video surveillance cameras, and learned from a neighbor that a dark color, small, four-door sedan, with no license plate had been captured on' a home camera security system circling the block prior to. the armed robbery. The video footage showed Murray’s grey Chevy Cobalt[1] circling the 600 block of Audubon Street twice prior to the robbery.
A few days after the robbery, Wales reached out to Detective Swahm In this meeting she admitted that she was providing marijuana for Mackey when the robbery took place, and told him -that the robbers had taken the marijuana along with the money from the sale. She also shared with Detective Swalm text messages from Mackey she had received prior to the robbery that she thought were suspicious. She returned to the police station with Detective Swalm whére she [ 4made an official statement and aided the police in drafting a composite sketch of one of the alleged assailants.
The detective obtained a subpoena for Mackey’s phone records, and learned that he had been in contact with Murray prior to and on the day of the robbery. Mackey’s *569 records reflected phone calls-with Wales and with a man named Julian Haynes[2] close to the time of the robbery as well.
Detective Swalm used information from the phone records request to locate Murray in the FIC (field interview card) database, and discovered that he had been stopped in his grey Chevrolet Cobalt, which had on a temporary license tag. The detective subsequently prepared a six-person photographic line-up which contained Murray’s photograph and presented the line-up to Wales. She positively identified Murray as one of the robbers.[3]
Detective Swalm obtained a warrant for Murray’s arrest for armed robbery. When the detective showed Murray the video footage of the Chevrolet Cobalt and informed him of Wales’s positive identification of him as one of the perpetrators, he waived his Miranda rights and gave a recorded statement. In his statement, he said he was contacted by Julian Haynes, who told him that he knew Mackey, who knew someone with a large supply of marijuana for sale. Murray never admitted entering the victim’s'apartment, but did confirm that the Chevrolet Cobalt seen in the surveillance was his. Subsequent to his recorded statement, he identified |fiMackey from a six-person photo lineup. Shortly after, Trent Mackey and Julian Haynes were also arrested for participating in the robbery.
Robert Murray’s Trial
At Murray’s trial, the State’s key witness was Wales. Among other things, she testified that Murray was the man who entered her apartment armed with a gun. She further testified that while she did procure marijuana for Mackey on at least three occasions before this incident, she was not a drug dealer'and was not making a profit on that sale or any other.
The transcript reflects the following testimony elicited from Wales with regard to the transaction the day of the robbery: DEFENSE COUNSEL:
Q. Right. You are selling your own weed to Mr. Trent, right? You’re not selling somebody’s weed, right?
A. It was somebody not of my possession.
Q. I’m sorry.
A. It was not mine. It was from a friend of mine. And it was nothing I was making a profit for. I was not a drug dealer, and I’m not a drug dealer, if that’s what you are asking, sir.
Q. And on the previous times that you sold drugs to Mr. Trent, that was also a friend’s weed that you were selling, and you didn’t make any profit off that either, did you?
A. That’s correct.
Wales was also less than truthful when confronted with questions about her relationship with Jamie Ratcliff, a friend of Mackey’s whom she had exchanged text messages with for the purposes of selling him marijuana. When Wales was [ Basked at Murray’s trial about her dealings with Jamie Ratcliff and her drug dealing activities in general, she testified that she only knew Ratcliff as Mackey’s friend and that she had never procured marijuana for him. She testified that “[h]e [Jamie Ratcliff] had contacted me for marijuana and then called me as well as, for cocaine, which I was not able to get for him. My only encounters regarding marijuana, small amount, was for Trent [Mackey].” She *570 then denied ever referring to the quantity of marijuana she had for sale as “McNug-gets” or “coming in many different flavors.” [4]
Murray chose to testify at trial. He denied any participation or involvement in the robbery. He testified he had never been inside Wales’s apartment. Murray stated that he had been in contact with Mackey around the time of the robbery because he had been asked to find a buyer for the marijuana Mackey intended to sell. Murray testified that he drove two unarmed purchasers to an apartment on Broadway Avenue on the day of the robbery. Murray said he knew only one of the purchasers by name, D-Nice. D-Nice brought the second man, who was unknown to the defendant. He testified that he drove around the block two times waiting for the purchasers to complete their transaction. According to Murray’s testimony, when he picked them up the only thing they had at that time was a backpack full of marijuana.
He stated he did not learn he had been implicated in a crime until two months later when the police arrived at his house. He went voluntarily to the |7station and spoke with authorities in the presence of his father. After talking to the police, he was booked with armed robbery.
The jury returned a unanimous guilty verdict on both counts.
Trent Mackey’s Trial
Mackey’s trial went forward a month after Murray was found guilty. Wales was again the key witness for the State. Her testimony at Mackey’s trial was substantially different from her testimony at Murray’s trial.
At Mackey’s trial when Wales was once again confronted with questions regarding her drug dealing activities, information came out that proved Wales was much more active in selling marijuana than she led the jury to believe in Murray’s trial. Wales admitted at Mackey’s trial to selling marijuana to other friends of hers, including Jamie Ratcliff. She also testified that Ratcliff came to her apartment the time she procured the marijuana for him, which conflicted with her assertion at Murray’s trial that Ratcliff had never been to her place by himself. At Mackey’s trial, she became defensive when questioned further about her dealings with Ratcliff. The court had to reprimand her and instruct her to answer the questions after she argued that she did not know how Ratcliff fell into the case. Defense counsel refreshed Wales’s recollection by showing her about twenty pages of text messages between Ratcliff and herself and then introduced the messages into evidence after she áuthenticated them.[5] The text messages indicate that Wales sent |sthe following text message to Ratcliff on July 5, 2012: “on deck! many new flavors on the menu added just today, please call if you are interested in menug-gets with your choice of sauce/size! haha happy thursday.” Ratcliff replied that he needed some; she asked how much and then instructed him to come by her place and that the cost would be $50.
Mackey was found not guilty.
*571 Julian Haynes and Megan Wales
Julian Haynes’s charges were dismissed after Mackey’s not guilty verdict. No one was charged with any narcotics violations in this ease. The State and Wales contend that she was not given a deal in exchange for her testimony, but it is of note that after the conclusion of Murray’s and Mack-ey’s trials her charge of aggravated battery with a weapon in an unrelated case was reduced to obstruction of justice and she was sentenced to probation.
SUFFICIENCY OF THE EVIDENCE
In his first assignment of error, Murray complains that the evidence is insufficient to support his convictions for armed robbery and conspiracy to commit armed robbery. More specifically, he challenges his identification as a participant in the crimes.
“When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence”[6] The standard for determining an insufficiency of |flevidence claim is well-settled. When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the Jackson standard, under which the court “must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.”[7]
Murray does not argue the State failed to meet its burden of proof in establishing the elements of the offense of armed robbery, but rather that the evidence presented at trial was insufficient to prove his identity as a participant in the crimes.
When the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification.[8] Based on Wales’s eyewitness testimony, the composite sketch she aided the police in drafting, and her subsequent identificar tion of Murray in a six-person lineup, we cannot say that a reasonable jury could not have found the identification sufficient.
MOTION FOR NEW TRIAL
Murray asserts in his second assignment of error that his motion for new trial should have been granted on the grounds of newly discovered evidence which proved that the sole eyewitness against him, Megan Wales, committed perjury at | mtrial. Specifically, he claims that Wales’s denial at his trial that she engaged in dealing marijuana for profit was proven false at Mackey’s trial. Murray avers that the State had knowledge that Wales was not being truthful in her testimony, yet failed to take any steps to correct the false testimony. He claims that he should be granted a new trial because Wales’s credibility is material to the case, and he did not receive a fair trial as a result of her perjury. He contends that the ends of justice require that he be given an opportunity to confront Wales with this new evidence. We agree.
Where the state allows a state witness to give false testimony, “a reviewing court must reverse the conviction if the *572 witness’s testimony reasonably could have affected the jury’s verdict, even if the testimony goes only to the credibility of the witness.”[9] The defendant must show that the state “acted in collusion with the witness' to facilitate false testimony.”[10] Additionally,' even where the state does not facilitate ■ the perjury, it has a duty to correct'false testimony.[11] “When false testimony has been given under such circumstances, the defendant is entitled to a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial,”[12] “However, the grant of a new trial based upon such a Napue violation is proper only if: (1) the statements at issue are shown to be actually false; (2) the prosecution knew they were false; and (3) the [^statements were material.”[13] Materiality has been described in terms of a “reasonable probability” of a different outcome.[14] “To say, that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record.”[15]
As discussed above, the record indicates that Wales presented false testimony at Murray’s trial, as illustrated by the striking differences in her statements at his trial versus those she made at Mackey’s trial regarding her drug dealing activities.
The record further indicates that ■ the State was aware that Wales was engaged in dealing marijuana to individuals other than Mackey, yet did nothing to correct her testimony when she stated otherwise at Murray’s trial. Detective Swalm spoke with Wales on multiple occasions during his investigation and was given permission to go through her text messages with Mackey. He was aware that she dealt marijuana and provided this information to his supervisors, who chose not to pursue charges against Wales. His report, which was redacted when it was provided to defense counsel, included the initials “J.R.” in reference to Jamie Ratcliff, indicating that he and Wales had spoken about her dealings with Ratcliff. This information leads to a reasonable inference that the State was aware that Wales was not being truthful when she testified at Murray’s trial. At the very least li¡>the State knew that the testimony that was elicited from Wales at Mackey’s trial was inconsistent from her testimony in Murray’s trial.
Wales’s statements were material as the State’s case against Murray rested heavily upon a determination of her credibility, considering that Murray’s own testimony contradicted Wales’s version of events, Murray’s jury was led to believe that Wales was only providing marijuana on a very occasional basis to her friend and co *573 worker- Mackey, while the truth was that she actually dealt marijuana to multiple individuals in varying amounts. As the only eyewitness against Murray, Wales’s credibility as to the truthfulness of her testimony is of the utmost importance in this case. It is reasonably probable that had the jury been made aware of her drug dealing activities and had the defense been given an opportunity to impeach her with this information, a different verdict would have resulted. It is of note that Mackey was found not guilty after Wales was confronted at his trial about her marijuana dealing practices and her false testimony at Murray’s trial.
Under these circumstances, wheré the sole eyewitness against Murray gave false testimony regarding her character, the trial court abused its discretion in denying a new trial. Only through the granting of a new trial can the defendant have the opportunity to examine Wales about her dealing marijuana and her providing-false testimony, so as to allow the jury to accurately assess her credibility.
^CONCLUSION
For these reasons we reverse the trial court’s denial of Murray’s motion for a new trial and remand the case for a new trial.
REVERSED AND REMANDED
JENKINS, J., CONCURS IN THE . RESULT

. During this investigation, the defendant confirmed to Swalm that he was driving the ’ grey ■ Chevy ' Cobalt captured in the surveillance footage.

. Julian Haynes was suspected of being involved in the crime early in the investigation, but charges against him were ultimately dropped,

., At a later, date, Detective Swalm presented Wales with a six-person lineup containing Julian Haynes’s photograph, but she was unable to make a positive identification.

. Defense counsel was encouraged by Mack-ey’s attorney to ask about these particular terms with respect to Wales’s drug dealing.

. The text messages were obtained by defense counsel directly from Jamie Ratcliff himself and were not provided to the appellant’s counsel until after the conclusion of Mackey’s trial. The record indicates that the clerk of court was unable to locate the original exhibits, but that Judge Landrum-Johnson ordered that copies of the messages that had been preserved by the Orleans Parish District Attorney's Office be filed and forwarded to this Court.

. State v. Hearold, 603 So.2d 731, 734 (La. 1992).

. State v. Neal, 2000-0674, p.9 (La. 6/29/01), 796 So.2d 649, 657 (citing State v. Captville, 448 So.2d 676, 678 (La. 1984)).

. State v. Weary, 2003-3067, p. 18 (La. 4/24/06), 931 So.2d 297, 311.

. State v. Phillips, 2010-0582, pp. 8-9 (La.App. 4, Cir. 2/17/11), 61 So.3d 130, 136, writ denied, 2011-0582 (La. 10/7/11), 71 So.3d 311, citing Napue v. Illinois, 360 U.S. 264, 269, 79 5.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959).

. State v. Broadway, 96-2659, p. 17 (La. 10/19/99), 753 So.2d 801, 814.

. Napue, 360 U.S. at 269, 79 S.Ct. 1173.

. Phillips, 61 So.3d at 136, citing Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

. Phillips, 61 So.3d at 136, citing United States v. O’Keefe, 128 F.3d 885, 893 (5th Cir. 1997).

. State v. Rubens, 2010-1114; p. 53 (La.App. 4 Cir. 11/30/11), 83 So.3d 30, 63, writ denied, 2012-0374 (La. 5/25/12), 90 So.3d 410, and writ denied sub nom. State ex rel. Rubens v. State, 2012-0399 (La. 10/12/12), 99 So.3d 37, citing Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

. Rubens, 83 So.3d at at 53, quoting Yates v. Evatt, 500 U.S. 391, 403, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991).