IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 99-30082
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee
Cross-Appellant,

versus

ERIC SCHMIDT; MICHAEL O'KEEFE, SR.;
JOHN O'BRIEN; GARY BENNETT,

Defendants-Appellants
Cross-Appellees,

PAUL SCHMITZ,

Defendant-Appellant.

_____

Appeal from the United States District Court for
the Eastern District of Louisiana
(USDC No. 95-CR-106-2-S)
_____

August 11, 2000


Before REAVLEY, DAVIS and BARKSDALE, Circuit Judges.

REAVLEY, Circuit Judge:[*]

---

Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R.

Five defendants appeal their convictions for conspiracy, mail and wire fraud, and money laundering in connection with a fraudulent insurance scheme. Michael O'Keefe, Eric Schmidt, John O'Brien, and Gary Bennett were convicted on the overarching count 1 conspiracy count and other counts. Paul Schmitz was convicted on a single mail fraud count. O'Brien also appeals his sentence, and the government cross-appeals on two sentencing matters. We affirm.

BACKGROUND

The evidence presented at trial supports the following events. O'Keefe, despite two prior fraud convictions, was selected to operate the management company of Physicians National Risk Retention Group, Inc. ("PNRRG"), a Louisiana medical malpractice insurer. The management company was named Associated Auditors (AA). Schmidt, O'Keefe's son-in-law, served as president of PNRRG. Bennett and O'Brien were also involved in the management of the PNRRG, and Schmitz was a claims manager.

PNRRG became insolvent and the state of Louisiana moved to liquidate it. The defendants arranged to have Builders and Contractors Insurance Limited (BCI), a dormant Bahamian corporation under the control of Charles Donaldson, act as a reinsurer. Defendants promised that coverage of PNRRG's physicians would continue and that all claims would be paid by BCI. PNRRG and the Louisiana Department of

_____

47.5.4.

2

Insurance authorized the transfer of over $10 million in cash assets of PNRRG to a trust account of O'Keefe's law firm, with the funds to be held on behalf of BCI. Defendants entered into a reinsurance contract with Sphere Drake, an established reinsurance company, but this contract was canceled a few months later. The defendants failed to maintain coverage and pay claims for the insured physicians as promised.

Instead, Associated Insurance Consultants, Inc. (AIC), a company owned by defendants Schmidt, Bennett, and O'Brien, signed a secret management contract with BCI. Ultimately, over $5 million in assets of PNRRG ended up in the personal bank accounts of the Schmidt, Bennett, and O'Brien.

The five defendants were charged in a multi-count indictment which included conspiracy, wire fraud, mail fraud, and money laundering counts. Two of the main government witnesses were Donaldson and Johnny Moore, participants in the scheme.

An FBI "302 report" was prepared prior to trial. The report documented an interview of Donaldson by an FBI agent. According to the report, someone had stated that "O'Keefe suggested that BCI's shareholders meeting minutes be altered to make it appear that Donaldson had authority to enter into the PNRRG/BCI contract." At trial, Donaldson testified and the government turned the 302 report over to defendants, as required by the Jencks Act, 18 U.S.C. § 3500. The government did not ask any questions about the 302 report. However, on cross-examination, Donaldson admitted that he had falsely accused O'Keefe of altering the minutes. Donaldson also, arguably, perjured himself at the trial by first claiming that he had altered the minutes, then stating that he

3

could not remember if he had accused O'Keefe of altering the minutes, and finally admitting that he had falsely told the FBI that O'Keefe had suggested that the minutes be altered. Judge Sear concluded after the trial that (1) Donaldson had falsely accused O'Keefe of participating in altering the minutes, (2) the government knew about this falsehood, (3) the government had failed to notify defendants of Donaldson's falsehood, and (4) defendants were therefore entitled to a new trial. Judge Sear recused himself after granting the new trial, but later denied a motion for reconsideration. The basis of the new trial was that even though the government did not try to prove that O'Keefe had altered the minutes, Donaldson had falsely accused O'Keefe of doing so, and this lie went to the credibility of Donaldson, a key witness.

The government appealed the order for new trial, and we reversed. United States v. O'Keefe, 128 F.3d 885 (5th Cir. 1997) (O'Keefe I). We concluded that a new trial was not warranted, noting that the jury was fully informed of Donaldson's false statements, and that the government had not relied on the false statements in presenting its case. See id. at 896-98. After we remanded the case to the district court, the district court considered motions for new trial on grounds of newly discovered evidence relating to Moore and Donaldson. Donaldson had allegedly received a secret $45,000 payment from the government which contradicted the government's statement to the jury that it had offered no promises or inducements to Donaldson beyond his plea agreement. Judge Lemmon denied the new trial motions, and entered judgments of conviction and sentenced the defendants.

4

DISCUSSION

A.    Sufficiency of Evidence

All five defendants challenge the sufficiency of the evidence.  The verdict will be upheld if a rational jury could have found the essential elements of the offense beyond a reasonable doubt.  See United States v. Walters, 87 F.3d 663, 667 (5th Cir. 1996).  We view the evidence, including all reasonable inferences drawn therefrom and all credibility determinations, in the light most favorable to the verdict.  See id.

1.    Conspiracy Count

Count 1 alleged a conspiracy to commit wire and mail fraud.  To sustain a conspiracy conviction under 18 U.S.C. § 371, the government must prove (1) an agreement between two or more persons, (2) to commit a crime, and (3) an overt act committed by one of the conspirators in furtherance of the conspiracy.  See United States v. Gray, 96 F.3d 769, 772-73 (5th Cir. 1996).  The elements of mail fraud under 18 U.S.C. § 1341 consist of (1) a scheme to defraud, (2) the use of the mails to execute the scheme, and (3) the specific intent of the defendant to commit fraud.  See United States v. Salvatore, 110 F.3d 1131, 1136 (5th Cir. 1997).  Wire fraud under 18 U.S.C. § 1343 can be established upon proof of (1) a scheme to defraud, and (2) the use of interstate wire communications in furtherance of the scheme.  See Gray, 96 F.3d at 773.  The Supreme Court has stated that because the mail and wire fraud statutes share the same language in relevant part, the same analysis applies to each.  See Carpenter v. United States, 484 U.S. 19, 25 n.6 (1987).

5

Defendants O'Keefe, Schmidt, O'Brien, and Bennett were convicted on the overarching conspiracy count. The indictment charged a wide-ranging scheme to use mail and wire facilities to execute a fraudulent scheme "(a) to defraud [PNRRG], its insured physicians and patients making medical malpractice claims against those physicians; (b) to obtain money and property by means of false pretenses, promises, and representations; and (c) to deprive [PNRRG] of its right to the honest services of its President, Eric Schmidt."

Evidence, some disputed and some undisputed, supports the following events and is sufficient to support the conspiracy convictions. O'Keefe, with two prior convictions, operated and owned AA, the management company of PNRRG. PNRRG had been organized by a group of physicians to provide themselves with liability insurance. AA became the management company after the Louisiana Department of Insurance (DOI) insisted that existing management be ousted in an attempt to financially salvage PNRRG.

Though PNRRG had substantial assets, it became statutorily insolvent and the DOI moved to liquidate it. The DOI had decided to place PNRRG in liquidation by late 1991. Prior to this decision the DOI had placed PNRRG in "conservation" under Louisiana law, through a judicial order by a state court. O'Keefe and Schmidt advised the PNRRG board to liquidate PNRRG and transfer the assets to a new insurer.

The defendants arranged to have BCI, a Bahamian corporation under the control of Charles Donaldson, act as a reinsurer. BCI was a dormant Bahamian insurance company at the time. An Agreement of Reinsurance between BCI and PNRRG was approved by

6

the PNRRG board and the DOI. Donaldson had worked with Bennett in the past. Donaldson pleaded guilty to misrepresenting his authority to execute the reinsurance agreement. Defendants falsely promised that coverage of PNRRG's physicians would continue and that all claims would be paid by BCI.

The board of PNRRG and the DOI authorized the transfer of over $10 million in cash assets of PNRRG to BCI, but the assets were to be held on American soil in a trust account of O'Keefe's law firm. As promised, defendants entered into a reinsurance contract with Sphere Drake Insurance p.l.c., an established British reinsurance company, but this contract was canceled a few months later, at O'Brien's suggestion, without notifying the DOI or the insured physicians or their agents. The district court concluded, properly under the evidence, that "a reasonable jury could have found that the defendants created a false impression that Sphere Drake was covering the risks when, in fact, the contract was canceled and the defendants received substantial profits realized by the cancellation."

The defendants failed to maintain coverage and pay claims for the insured physicians as promised, and misrepresented that certain claims would be the reinsurers' responsibility. Instead, AIC, a company owned by defendants Schmidt, Bennett, and O'Brien, signed a secret management contract with BCI. O'Keefe acted as AIC's attorney. According to Bennett, AIC was originally formed by O'Keefe and Schmidt. Under the AIC/BCI agreement, 90 percent of any profit to BCI flowed to AIC. Schmidt, Bennett and O'Brien received over $5 million in "profits" from the O'Keefe trust

7

account, after these funds passed through an account in the Bahamas. Funds went from the O'Keefe trust account to a Bahamian company called "Captive Managers," a sole proprietorship owned by Donaldson, who received a fee of $150,000. The funds were then almost immediately wired back to a bank account in New Orleans and largely distributed to Schmidt, Bennett, and O'Brien. District judge Lemmon concluded that defendants used AIC as a vehicle to divert PNRRG's funds "in a bogus reinsurance agreement" with BCI. The district court fairly summarized the evidence in concluding that defendants paid Donaldson "to sign agreements and other documents on behalf of [BCI] and to funnel [$5.6 million] from the United States through [a Bahamian bank account] and to return the funds to the AIC bank account in New Orleans."

Defendants failed to disclose to the DOI and the PNRRG board that they would realize millions of dollars through their management of the reinsurance plan, and at one point denied that they would benefit financially from their efforts for the physicians.

Of the $10.7 million transferred to the O'Keefe trust account as the sum necessary to fund the reinsurance plan, defendants received over $5 million in "profits" in addition to almost $2 million paid in management fees to AIC. The PNRRG board never authorized defendants to personally receive such profits. The "profits" were funds available because defendants had canceled the Sphere Drake contract, canceled coverage for physicians, and refused to pay claims. BCI, the company that was supposedly behind the reinsurance program, received no funds. These "profits" vastly exceeded the amount paid in claims.

8

No action was taken by the DOI when it discovered that defendants were canceling policies because O'Keefe promised Johnny Moore, the attorney for PNRRG's estate who was responsible for taking action, that he would use his political influence to help Moore retain his position, and that Moore could use over $500,000 placed in trust with Moore as part of the reinsurance agreement. Moore and O'Keefe had negotiated the reinsurance contract. Moore is a private attorney who had been hired by the DOI to represent it in the conservation and liquidation of PNRRG. He took over $500,000 held in trust for personal use and pleaded guilty to a state bribery charge and a federal mail fraud count. In a recorded conversation, O'Keefe urged Moore not to reveal that he had taken the money.

To be sure, some of the evidence recited above was disputed. Nevertheless, we conclude that this evidence is sufficient to support the conspiracy convictions, in that a rational jury could find under this evidence that Schmidt, O'Keefe, O'Brien, and Bennett engaged in a fraudulent scheme to surreptitiously siphon off millions of dollars in PNRRG assets. Defendants make numerous sufficiency arguments which we find unavailing.

O'Keefe argues that under Neder v. United States, 527 U.S. 1 (1999), decided after the trial, the Court held that mail and wire fraud statutes require that the misrepresentation or concealment concern a material fact, id. at 20-25, and that in the pending case any misrepresentations or omissions were not material. The jury was not instructed on the element of materiality, a matter discussed further below, but here we

reject O'Keefe's argument that the evidence is insufficient to establish that defendants made material misrepresentations and omissions. In general, a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the party to which it was addressed. Id. at 16. The government's theory, supported by the evidence, was that defendants hatched a scheme to steal the assets of PNRRG. To this end, defendants misrepresented or failed to disclose material facts discussed above. For example, they misrepresented that coverage of PNRRG's physicians would continue and that all claims would be paid by BCI, misrepresented that they would not personally profit from the transactions, failed to disclose that they had canceled excess coverage, and failed to disclose their plan to transfer millions of dollars intended to capitalize the new insurance venture to their personal bank accounts. One government witness, DOI actuary Scruggs, testified that if the DOI had known what the defendants were going to cancel doctors' coverage, it would not have entered into the reinsurance agreement with defendants and would have saved $8 million for the company in liquidation. We think these misrepresentations and nondisclosures were certainly capable of influencing the PNRRG board and the DOI.

Appellant Bennett devotes his appeal to sufficiency of the evidence, and presents an alternative version of events that is completely at odds with the government's theory of the case. Briefly, he argues as follows. Professionals at the DOI, on the advice of numerous outside professionals, had agreed on the plan in which the defendants participated. Under this plan, some of the low risk doctors insured by PNRRG were to be

10

separated into a new company, and some of PNRRG's assets were to be transferred to this new company. This idea actually came from an insurance expert from Missouri, William O'Bryan, whom the DOI had sought out. BCI was intended to serve only as a temporary place to "park" the insurance policies of the low risk doctors until a permanent American company could be found. An estimate was made of how much cash was needed to capitalize this new company, based on complex risk assumptions. Contracts were signed, and the defendants operated within the confines of these agreements. The defendants received a large profit not because of fraud, but only because the anticipated claims were higher than the actual claims, and there was no contractual provision for the return of profits to the DOI or the estate of PNRRG. No one, including defendants, had anticipated the windfall. Moore was a thief who stole money from an attorney trust account, and testified against the defendants for a reduction in sentence. Donaldson was caught misrepresenting his authority to act for BCI and entered into a plea bargain. He lied to the FBI and again in federal court, resulting in the new trial granted by Judge Sear. AIC was a legitimate company responsible for all the administration of the claims and policies. BCI did not have the capacity to perform such functions. The profits of AIC were personal profits of defendants O'Brien, Schmidt, and Bennett because AIC was a subchapter S corporation under the tax laws, and all income to such a corporation was taxable to the owners. The owners paid taxes and then used the remainder to capitalize Lemé Reinsurance Limited, a company formed to provide permanent coverage for the physicians.

11

While Bennett's version of events is not wholly implausible, we note that much of his argument is made without citation to the record. In any event, the evidence described above is more than sufficient to uphold the jury verdict. Donaldson and Moore were extensively cross-examined, and the jury was entitled to weigh their credibility. The jury is the final arbiter of the credibility of witnesses. See United States v. Restrepo, 994 F.2d 173, 182 (5th Cir. 1993). A guilty verdict may be sustained if supported only by the uncorroborated testimony of a coconspirator, even if the witness is interested due to a plea bargain, unless the testimony is incredible or insubstantial on its face. See United States v. Gadison, 8 F.3d 186, 190 (5th Cir. 1993); United States v. Hernandez, 962 F.2d 1152, 1157 (5th Cir. 1992). Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature. See Gadison, 8 F.3d at 190; United States v. Hoskins, 628 F.2d 295, 297 (5th Cir. 1980). Insofar as Donaldson lied to the FBI and in court (which the government disputes), those lies were rejected as a ground for a new trial in O'Keefe I. A rational jury could conclude that Moore, the attorney who was supposed to regulate defendants, was bribed or at least encouraged by O'Keefe to raid his trust account.

Given the totality of the evidence presented, a rational jury simply was not required to accept Bennett's explanation on appeal for why millions of dollars ended up in his personal bank account and the accounts of other defendants. The assets of PNRRG were placed with BCI in a trust account in the United States, yet over $5 million in

12

"profits" was funneled through the Bahamas and back to the United States in transactions the jury could have found fraudulent. There was evidence that defendants had represented that there would be no profits, and that they concealed the agreement between BCI and AIC. Though defendants including Bennett claim the contractual arrangement between BCI and AIC was disclosed, there was ample evidence to the contrary. The jury could have reasonably concluded that defendants were able to secure "profits" from an insolvent insurer only because reinsurance from an established company was canceled, claims were not paid, and coverage for the insured physicians was not renewed. In the words of Judge Sear, the defendants' profit reversion "was confected by the defendants." Bennett insists that BCI had a contractual right to terminate the reinsurance coverage with Sphere Drake, and that canceling the coverage was legitimate when claims that came in were smaller than expected, especially since the cost of the Sphere Drake coverage was very high. However, the district court concluded that "a reasonable jury could have found that the defendants created a false impression that Sphere Drake was covering the risks when, in fact, the contract was canceled and the defendants received substantial profits realized by the cancellation."

O'Brien and Bennett argue that certain testimony, such as testimony concerning which claims BCI was supposed to cover, are contradicted by the terms of the PNRRG/BCI written contract of reinsurance and are therefore inadmissible under the parol evidence rule. They cite no federal law that a criminal wire or mail fraud

13

conviction cannot rest on misrepresentations that are inconsistent with the final written terms of an agreement. We see no merit to this argument.

2.      Other Counts

The convictions on counts 2 and 4-8 are mail and wire fraud convictions of the four defendants—O'Keefe, Schmidt, O'Brien, and Bennett—convicted on the count 1 conspiracy count. They relate to various mailings and wire communications "for the purpose of executing the scheme set forth above," i.e., the count 1 conspiracy. The convictions on counts 14-23 are money laundering convictions of these four defendants under 18 U.S.C. § 1956(a)(2)(A). These counts allege money wire transfers "with the intent to promote the carrying on of specified unlawful activity, that is mail and wire fraud as set forth in Counts 2 through 13." The defendants argue that since they are all tied to the conspiracy count, they must fail if the conspiracy conviction is reversed, since there was no fraudulent scheme that will support them. These defendants offer no independent reason why the evidence was insufficient on these other counts if, as we hold, the evidence is sufficient to support their convictions on count 1.

Schmitz challenges his mail fraud conviction on count 12. He was convicted solely on this count, and the other defendants were acquitted on this count. It alleged that "for the purpose of executing the scheme set forth above," i.e., the count 1 conspiracy, Schmitz sent a letter to Mark Wham, falsely stating that Schmitz was acting at the direction of the principals of Builders and Contractors Insurance, Ltd., a Bahamian Corporation, in offering a settlement for nuisance value, when the defendants had total

control over disbursements of funds for the payment of claims. Wham was a personal injury lawyer with a claim against a physician who had coverage originally with PNRRG and whose coverage was transferred to BCI. Wham testified that Schmitz, acting as a claims manager, had pressured Wham to settle for nuisance value by telling Wham that he was dealing with a company out of the Bahamas with limited funds. Schmitz sent a letter as part of this negotiation. The government claims that Schmitz's conduct was fraudulent because he falsely stated in the letter that he was acting at the request of BCI, and he knew that there was money set aside in the United States to pay claims. Ultimately the physician in question was forced to settle the case out of his own pocket and Wham received no fees. Judge Sear noted that Schmitz testified before the grand jury "that he did not and was not going to contact anyone at BCI and representations to this effect contained in the letter to Wham and others were not true."

We conclude that the evidence is sufficient to support Schmitz's mail fraud conviction on count 12. A rational jury could find that Schmitz's conduct was part of a scheme to stop paying claims and transfer the assets of PNRRG to defendants.

Schmitz's acquittal on the conspiracy count and the acquittal of the other defendants on count 12 does not help him. Even if the jury's verdict is inconsistent, and we are not persuaded that it is, such an inconsistency does not require reversal of his conviction. See United States v. Powell, 469 U.S. 57, 62 (1984); Dunn v. United States, 284 U.S. 390, 393 (1932). Both the interest and the appearance of justice are fully vindicated as long as the reviewing court assures itself, as we do, that regardless of an

15

acquittal on some other count, the evidence is legally sufficient to support a guilty verdict on the count of conviction. See Powell, 469 U.S. at 66-69. Given "the Government's inability to invoke review, the general reluctance to inquire into the workings of the jury, and the possible exercise of lenity . . . the best course to take is simply to insulate jury verdicts from review on this ground." Id. at 68-69.

B.      Jury Charge and Response to Jury Question

1.      Materiality Instruction

Defendants complain that the jury charge was flawed because it did not instruct the jury on the issue of materiality with respect to mail and wire fraud. As explained above, the Supreme Court held in Neder, decided after the trial of the pending matter, that materiality is a element under the wire and mail fraud statutes. As the government points out, there is some language in the jury instructions regarding materiality, such as the instructions that intent to defraud may be found "from a material misstatement of fact made with reckless disregard of the facts," and that "[a] statement is or representation is 'false' within the meaning of the wire fraud and mail fraud statutes when it constitutes a half truth, or effectively conceals a material fact, provided it is made with intent to defraud." However, the jury charge did not plainly explain that materiality of falsehood is a separate element of the mail and wire fraud statutes. Defendants did not object to the trial court's failure to so instruct the jury.

The omission of the materiality element of the crime in the jury charge is subject to harmless error review if the defendant objected to the error. See Neder, 527 U.S. at 4-

16

6.  In the absence of an objection to the jury charge, however, the omission of the element is reviewed for plain error even if the law changed after the trial.  See Johnson v. United States, 520 U.S. 461, 463-66 (1997).  Under this limited review, there must (1) exist an "error," (2) that is "plain," and that (3) affects the substantial rights of the defendant.  Id. at 466-67.  In discussing whether an error affected the defendant's "substantial rights," the Supreme Court explained that in most cases this means that the error "must have affected the outcome of the district court proceedings." United States v. Olano, 507 U.S. 725, 734 (1993).  Even if these requirements are met, an appellate court may in its discretion correct a plain error only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.  Johnson, 520 U.S. at 467.

Defendants do not establish reversible error under the plain error standard.  As discussed above, we conclude that the evidence would support a jury finding that the misrepresentations and omissions were in fact material.  Defendants do not show that the inclusion of a materiality instruction in the already complex charge would have altered the outcome of the jury's deliberations.  While defendants put on a vigorous defense,  the jury obviously accepted the government's theory that defendants schemed to fraudulently siphon off the assets of PNRRG from the inception of their dealings with PNRRG and the DOI.  There was clear evidence of materiality.

2.     Response to Jury Question

Schmitz complains of the district court's response to a jury question.  During deliberations, the jury asked:  "Can a defendant be found guilty of count 12 without

17

knowingly furthering the scheme set forth in the indictment?"  The court answered:  "I cannot respond any better than I have in the charge which I gave you.  Read it as it applies to this count."

A trial judge enjoys wide latitude in deciding how to respond to a question from the jury.  See United States v. Stevens, 38 F.3d 167, 170 (5th Cir. 1994).  We have explained that "[w]hen evaluating the adequacy of supplemental jury instructions, we ask whether the court's answer was reasonably responsive to the jury's question and whether the original and supplemental instructions as a whole allowed the jury to understand the issue presented to it."  Id.  Further, since Schmitz did not object to the court's supplemental instruction, our review is for plain error.  See United States v. Rogers, 126 F.3d 655, 660 (5th Cir. 1997).  We see no plain error.  Schmitz does not show that the original charge was defective, so we fail to see how referring the jury back to the original charge could amount to plain error.  Furthermore, the original charge  answers the jury's question, since it plainly states that count 12 is based on a letter allegedly mailed on or about the date stated in the indictment "for the purpose of executing the scheme charged in the indictment . . . ."  The jury could find the answer to its question by reading the charge.

C.     Indictment

Schmitz complains that the superseding indictment does not set out the substantive offenses in counts 2-23 with sufficient particularity.  We review de novo questions of the sufficiency of the indictment.  See United States v. Cabrera-Teran, 168 F.3d 141, 143

(5th Cir. 1999).  The government points out that this objection was not made until after trial, but challenges based on the failure to charge an offense may be made at any time.  See United States v. Fitzgerald, 89 F.3d 218, 221 (5th Cir. 1996).  We have however found that review is more limited if there was no objection until after the trial began, agreeing with other circuits that in such circumstances "indictments are liberally construed in favor of validity where they are tardily challenged."  United States v. Green, 964 F.2d 365, 374 (5th Cir. 1992).

An indictment is sufficient when it (1) contains the elements of the offense charged, (2) fairly informs the defendant of the charges he must meet, and (3) there is no risk of future prosecutions for the same offense.  See United States v. Arlen, 947 F.2d 139, 144 (5th Cir. 1991).  In assessing the sufficiency of an indictment, we focus on practical, not technical, considerations.  See United States v. Chaney, 964 F.2d 437, 446 (5th Cir. 1992).

Schmitz does not establish that the indictment is defective under these standards.  He complains that the substantive counts only incorporated paragraph B of count 1 and failed to incorporate paragraph C of the same count.  We see no merit to this argument.  Paragraph C was not incorporated because it listed numerous overt acts which would not have made sense if included in each separate substantive count.  Each substantive count, alleges that specified defendants "for purposes of executing the scheme set forth above," committed specific overt acts in violation of the wire, mail, or money laundering statutes.  Defendants were fairly informed of the charges.

19

D.      Admission of Prior Convictions

O'Keefe complains that the district court erred in admitting evidence of his two prior fraud convictions. Other defendants also complain that they were prejudiced by this evidence. Schmidt complains that he was particularly prejudiced because he is O'Keefe's son-in-law. The only evidence of the prior convictions was the judgments of conviction themselves, and the district court instructed the jury to limit its consideration of the prior convictions to the issue of O'Keefe's intent.

The government and O'Keefe disagree on whether a proper objection was made below. We assume without deciding that a timely objection was made. Assuming such an objection, admission of prior bad acts evidence under Fed. R. Evid. 404(b) is reviewed for clear abuse of discretion. See United States v. Guerrero, 169 F.3d 933, 943 (5th Cir. 1999).

Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." This court has established a two-prong test that governs the admissibility of Rule 404(b) evidence. First, the evidence must be relevant to an issue other than the defendant's character. Second, the probative value of the evidence must not be substantially outweighed by its undue prejudice and the evidence must meet the other requirements of Rule 403. See United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978) (en banc).

20

The district court applied this test, and in so doing analyzed the similarity of the prior and charged offenses. It did not clearly abuse its discretion in admitting the convictions as evidence of intent. We have frequently held that prior convictions are admissible under Rule 404(b) to prove intent, particularly in conspiracy cases. See United States v. Prati, 861 F.2d 82, 86 (5th Cir. 1988); United States v. Henthorn, 815 F.2d 304, 308 (5th Cir. 1987). "[I]n a conspiracy case the mere entry of a not guilty plea raises the issue of intent sufficiently to justify the admissibility of extrinsic act evidence." Prati, 861 F.2d at 86. As we explained in United States v. Roberts, 619 F.2d 379 (5th Cir. 1980), evidence of a prior conviction is admissible to prove intent in a later conspiracy case involving the same criminal activity, given the unique difficulties in proving intent in a conspiracy case:

> Charges of conspiracy involve considerations not present in other criminal prosecutions. . . . Unequivocal evidence that a defendant committed a substantive offense may justify the inference that he intended to do so, but it does not plainly support the conclusion that he agreed and planned with others to commit the crime. Evidence of a defendant's association and dealings with a group of conspirators, even when he knows they intend to commit a crime, does not alone show that he himself had the requisite intent to join the conspiracy. In every conspiracy case, therefore, a not guilty plea renders the defendant's intent a material issue and imposes a difficult burden on the government. Evidence of such extrinsic offenses as may be probative of a defendant's state of mind is admissible unless he affirmatively takes the issue of intent out of the case.

Id. at 382-83 (brackets, citation, quotation marks omitted).

O'Keefe cites United States v. Brown, 71 F.3d 1158 (5th Cir. 1995), in which we reversed a conviction for possession of cocaine with intent to distribute. The defense had

21

put on one defense witness, and the prosecutor asked her whether she was aware of the defendant's prior drug conviction.  Brown is distinguishable because it was not a conspiracy case and the government conceded that the prior conviction was admissible, if at all, as probative only on the issue of the defendant's identity.  We held that the prior conviction was not probative on the issue of the witness' identification, and that the district court had erroneously instructed the jury.  See id. at 1162-63.  In the pending case the prior convictions were admitted to prove intent, a purpose we have sanctioned in conspiracy cases, as discussed above, and the jury was properly instructed.

E.      Severance Motion

Schmidt complains that the district court erred in denying his motion for severance.  He argues that he moved for severance after he learned that the government intended to introduce O'Keefe's prior convictions.  He also complains in his brief that "[t]he spillover effect of the connection between O'Keefe and Donaldson and O'Keefe and Moore presented a direct threat to Schmidt at trial."

The district court's denial of a motion to sever is reviewed for an abuse of discretion.  See  United States v. Pena-Rodriguez, 110 F.3d 1120, 1128 (5th Cir. 1997).  To demonstrate an abuse of discretion, the defendant "bears the burden of showing specific and compelling prejudice that resulted in an unfair trial and such prejudice must be of a type against which the trial court was unable to afford protection."  Id. (quoting United States v. Faulkner, 17 F.3d 745, 759 (5th Cir. 1994)).  We have further noted that "[t]he rule, rather than the exception, is that persons indicted together should be tried

22

together, especially in conspiracy cases," and that "the mere presence of a spillover effect does not ordinarily warrant severance." United States v. Pofahl, 990 F.2d 1546, 1483 (5th Cir. 1983).

We have stated that "acquittals as to some defendants on some counts support an inference that the jury sorted through the evidence and considered each defendant and each count separately." United States v. Ellender, 947 F.2d 748, 755 (5th Cir. 1991). In this case all the defendants were acquitted on one or more counts. We have further noted that appropriate instructions can reduce the possibility that the jury will improperly transfer proof of guilt from one defendant to another. Id. at 755. Instructions to consider separately each count and the evidence pertaining to it, and to give separate consideration to the evidence as to each defendant, have been held sufficient to eliminate the possibility of undue prejudice. See Faulkner, 17 F.3d at 759. In the pending case the jury was given standard instructions to consider separately the evidence as to each defendant.

The district court did not abuse its discretion in denying the motion for severance.

F.      New Trial Motion Relating to Donaldson

Defendants moved for new trial based on newly discovered evidence concerning Donaldson. They argue that they discovered at sentencing, for the first time, that the government consented to Donaldson's use of $45,000 to pay court-ordered restitution of $150,000. The $45,000 was allegedly funds that remained in Donaldson's lawyer trust account. They claim that this information is impeachment evidence under Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972), and

23

therefore should have been disclosed by the prosecution. They also claim that the failure to provide this information gave a false impression, since the plea agreement stated that there were "no other promises or inducements" to Donaldson.

Generally, we review the denial of a motion for new trial based on newly discovered evidence exclusively for abuse of discretion. Such motions are disfavored and are reviewed with great caution. In order to merit a new trial, the defendant must prove that (1) the evidence is newly discovered and was unknown to him at the time of trial, (2) the failure to discover the evidence was not due to his lack of diligence, (3) the evidence is not merely cumulative, but is material, and (4) the evidence would probably produce an acquittal. See United States v. Jaramillo, 42 F.3d 920, 924 (5th Cir. 1995).

To establish a Brady claim, the defendant must show that the government suppressed evidence favorable to him. See United States v. Ellender, 947 F.2d 748, 756 (5th Cir. 1991). The prosecution is not obligated to produce evidence or information already known to the defendant, or that could be obtained through the exercise of reasonable diligence. See Brown v. Cain, 104 F.3d 744, 750 (5th Cir. 1997). In the pending case the government argues that defendants were aware of the $45,000 because it originated with O'Brien, and denies that there was any "secret deal" whereby the government consented to use of the $45,000 to pay the restitution order. According to the government, the sentencing judge simply became aware of it and ordered its payment to victims.

24

Assuming without deciding that the government suppressed evidence, a <u>Brady</u> violation only occurs when the government suppresses <u>material</u> evidence, including impeachment evidence, favorable to the accused. <u>See</u> <u>Giglio</u>, 405 U.S. at 154; <u>Brady</u>, 373 U.S. at 87. Such evidence is material if there is a reasonable probability that the outcome of the trial would have been different if the evidence had been disclosed. <u>See</u> <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985). <u>Bagley</u> established that even a direct, undisclosed payment to a witness is not a reversible per se <u>Brady</u> violation, if the court finds under the materiality requirement that the defendant has not shown a reasonable probability that the result of the trial would have been different if the evidence had been disclosed. <u>See</u> <u>id</u>. at 671-72, 682.

The district court did not err in denying a new trial based on Donaldson's alleged use of funds from his lawyer's trust account to make restitution. Donaldson told the jury of his conviction and was extensively cross-examined. The jury was well aware that he was testifying in hopes of leniency. Donaldson's credibility on the stand was the subject of <u>O'Keefe I</u>. We noted, in reversing an order for new trial, that Donaldson had been subjected to "devastating cross-examination," and that "given the degree of impeachment of Donaldson on the stand, any further impeachment of the type that the defense now desires would merely have been cumulative." 128 F.3d at 896-97. We also noted that "the testimony of Donaldson was overwhelmingly corroborated by other witnesses." <u>Id</u>. at 897. For these same reasons, defendants are not now entitled to a new trial on similar grounds. While Donaldson was an important witness, whether he was allowed to pay

25

restitution from a trust account strikes us as a relatively minor matter. Defendants have not shown a reasonable probability that the outcome of the trial would have been different if this evidence had been disclosed.

O'Keefe also complains that the district court erred in denying his request for an evidentiary hearing on the new trial motion. Denial of a hearing on a motion for new trial is reviewed for abuse of discretion. See United States v. MMM Corp., 954 F.2d 1040, 1046 (5th Cir. 1992). We see no abuse of discretion. Assuming that O'Keefe's factual allegations regarding this point are entirely accurate, he did not show that he was entitled to a new trial.

O'Keefe separately argues that the prosecution concealed its "active efforts" to hide Donaldson's false statements. While characterizing this claim as one of newly discovered evidence, this argument strikes us at least in part as a rehash of questions raised in O'Keefe I, namely, whether Donaldson falsely accused O'Keefe of altering certain corporate minutes and whether the government suppressed its knowledge of the false statement. Our earlier panel has already ruled that Donaldson's false statements did not entitle defendants to a new trial. O'Keefe argues that there was some kind of a secret agreement that the government would not prosecute Donaldson for his perjury, but he offers nothing but conjecture that such an agreement existed.

G.    New Trial Motion Relating to Moore

O'Keefe argues that after the trial, in civil cases arising out of the liquidation of PNRRG, Moore's counsel filed a statement taking the position that the DOI owed Moore

26

$400,000 in legal fees, and therefore his use of $400,000 of the $527,000 in his trust account was legitimate. The district court denied the motion for new trial based on this alleged newly discovered evidence. At the trial, defendants cross-examined Moore and he testified that he had taken the position that he had spent the money from the trust account because his legal bills had not been paid. Hence, the evidence was not newly discovered and it came out at the trial. In any event, even if Moore changed his story, and now claims that he stole less PNRRG money than he told the jury, defendants do not show that the alleged newly discovered evidence would probably produce an acquittal. See United States v. Jaramillo, 42 F.3d 920, 924 (5th Cir. 1995).

O'Keefe also claims that at trial Moore testified that money in the trust account was BCI's money, while in the later civil proceeding he claimed that the funds belonged to the PNRRG estate. There is trial testimony where Moore stated, on cross-examination, that the money he held in trust belonged to BCI, because it had been transferred to BCI "for me to hold until such time as the accounting was made." So again there is no newly discovered evidence. Further, O'Keefe does not explain convincingly why it matters whether the funds were held in trust for BCI or PNRRG.

This evidence, even if newly discovered, does not change the fundamental facts that Moore admitted he stole money from his trust account with O'Keefe's blessing, and had pleaded guilty to such and was testifying pursuant to a plea agreement. The district court did not abuse its discretion in denying a new trial.

27

O'Keefe also complains that the district court erred in denying a hearing on this motion, but again, assuming that O'Keefe's factual allegations regarding this point are accurate, he did not show that he was entitled to a new trial.

H.    Due Process Claim Regarding District Court's Rulings Following Remand

Schmidt raises a due process argument.  As we understand it, he argues first that Fifth Circuit erroneously restricted the district court from considering Brady questions which were raised in the district court but were not addressed in the O'Keefe I  appeal, and argues second that even if the Fifth Circuit did not so err, the district court erroneously interpreting our rulings as prohibiting it from considering these Brady questions. The only alleged Brady violations about which appellants complain in the pending appeal are discussed above.

We first disagree with any suggestion that our prior rulings prohibited the district court from considering these Brady questions.  In  O'Keefe I we remanded the case to the district court for consideration of those grounds for new trial which the district court had not yet reached. 128 F.3d at 899.  In a later mandamus proceeding in this court brought by the government, we granted certain mandamus relief, but made clear that our order "does not deal with the motion for new trial based on newly discovered evidence, which is not before this court."

The district court duly ruled on the motions for new trial which were before it after remand.  For the reasons explained above, the district court did not err in denying the new trial motions.

28

I.      Cumulative Error

O'Keefe argues that the cumulative effect of all the district court's errors warrants reversal. We have recognized that a conviction may be reversed for cumulative errors, regardless of "whether any one of the errors standing alone would be sufficient to justify reversal." United States v. Riddle, 103 F.3d 423, 435 (5th Cir. 1997). For the reasons discussed above, O'Keefe has not demonstrated cumulative trial errors which would justify a reversal under the cumulative error doctrine.

J.      Enhancement of O'Brien's Sentence for Special Skills

O'Brien complains of the sentence enhancement he received for use of a special skill under U.S.S.G. § 3B1.3. This enhancement applies to one who "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." Application note 3 states that a special skill "refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts."

O'Brien argues that there was no proof that he used his special skills "in a manner that significantly facilitated the commission or concealment of the offense" under the guideline. "The government generally must prove factors for enhancement of sentencing by a preponderance of the evidence." United States v. Canada, 110 F.3d 260, 263 (5th Cir. 1997). Whether O'Brien used his special skills is a question of fact. We accept the district court's fact findings regarding sentencing unless they are clearly erroneous. See

29

18 U.S.C. § 3742(e). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." United States v. Krenning, 93 F.3d 1257, 1269 (5th Cir. 1996). A district court's finding of fact will be deemed clearly erroneous only if we are left with the definite and firm conviction that a mistake has been made. See United States v. Graves, 5 F.3d 1546, 1556 (5th Cir. 1993). This court examines the district court's factual finding regarding sentencing for clear error and affords great deference to the court's application of the guidelines to its factual findings regarding sentencing. See United States v. Snell, 152 F.3d 345, 346 (5th Cir. 1998).

The enhancement rested on the presentence report (PSR) and the court's finding that O'Brien was a MBA, a CPA, and a certified underwriter with experience in the insurance industry. Initially, the PSR found that O'Brien "used his extensive skills in business, insurance and accounting to facilitate the commission of the offense." In an addendum, the probation officer added that by O'Brien's own admission in a pleading he searched for a stop-gap insurer, worked toward establishing a doctor-controlled pool, rejected certain companies, contacted a broker in the Bahamas and worked Sphere Drake into the agreement. He also testified that he "was in charge of operations" at PNRRG. There was evidence that it was O'Brien who recommended canceling Sphere Drake, and that he drafted or at least worked on the BCI/AIC contract, the secret contract that allowed the defendants to siphon off the "profits" of the BCI/PNRRG reinsurance agreement. The district court did not clearly err in imposing this sentencing enhancement.

30

K.    Cross-Appeal on Sentencing

The government cross-appeals, arguing that the district court erred in failing to find that the victims were particularly vulnerable, and in calculating loss figures used for restitution that were too low.

The government argues that injured patients were vulnerable victims under U.S.S.G. § 3A1.1(b)(1).  The district court reasoned that the "victims" were physicians who "were exposed to claims for medical malpractice for which they were not protected by insurance," rather than patients.  "The determination that a victim is vulnerable is a factual finding which the district court is best suited to make."  United States v. Burgos, 137 F.3d 841, 843 (5th Cir. 1998).  We see no clear error.  Patients became indirect victims of the fraud only if physicians were unable to obtain alternative insurance or cover the losses personally.  The district court did not clearly err in concluding, in effect, that it could not hold that the defendants knew or should have known of such an indirect harm to patients.  Further, while injured patients are certainly entitled to sympathy, it does not necessarily follow that they are "unusually vulnerable" under the guideline.  See U.S.S.G. § 3A1.1 n.2.

On the loss calculation issue, the government argues that the district court should not have excluded about $4 million that defendants invested in other insurance companies which ultimately failed.  The district court ordered restitution of a little over $1 million from each defendant other than Schmitz.  A district court's order imposing restitution is reviewed for abuse of discretion.  See United States v. St. Gelais, 952 F.2d 90, 97 (5th

Cir. 1992); see also United States v. Hughey, 147 F.3d 423, 436 (5th Cir. 1998) ("Once we have determined that an award of restitution is permitted by the appropriate law, we review the propriety of a particular award for an abuse of discretion.").

The district court was concerned that the $4 million did not benefit defendants; it was reinvested in other insurance companies that also failed and were seized by government officials. Schmidt claims, and the government does not dispute, that of the over $5 million that was initially transferred from the O'Keefe trust account to defendants, all of this money was either paid to the federal government in the form of income taxes or was seized by the Louisiana DOI. On this record we cannot say that the district court abused its discretion in limiting restitution as it did.

AFFIRMED.